SME:JKW/NMA/KAN/KR
F. #2017R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                      Docket No. 20-CR-328 (DG)

ASANTE KWAKU BERKO,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X


## MEMORANDUM OF LAW IN SUPPORT OF
## THE GOVERNMENT'S MOTIONS IN LIMINE


JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Jessica K. Weigel
Nick M. Axelrod
Assistant U.S. Attorneys

Katherine Nielsen
Trial Attorney
Katherine Raut
Assistant Chief, FCPA Unit
    (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT BACKGROUND ............................................................................................... 2

ARGUMENT ........................................................................................................................ 7

I.  The Court Should Admit Publicly Available Documents Archived on
     Ghanaian Government Websites................................................................................. 7

II.  The Court Should Admit Summary Charts Pursuant to Fed. R. Evid.
     1006......................................................................................................................... 12

III.  The Court Should Allow the Government to Introduce Evidence
     Establishing Venue Under the First Brought Venue Statute and
     Preclude Any Improper Arguments About Venue.................................................... 16

IV.  The Court Should Permit the Government to Introduce the Defendant's
     Other Acts Evidence as Direct Evidence of the Charged Crimes or, In
     the Alternative, Pursuant to Rule 404(b) ............................................................... 24

V.  The Court Should Preclude the Defendant From Re-Litigating the
     Motion to Suppress and to Dismiss ........................................................................ 34

VI.  The Court Should Preclude the Defendant From Impeaching the
     Confidential Source or Cross-Examining Law Enforcement Witnesses
     about their Purported Failure to Consider the Confidential Source's
     Reliability............................................................................................................... 36

VII.  The Court Should Preclude Evidence or Argument Regarding the
     Government's Charging Decisions and Policies....................................................... 42

VIII.  The Court Should Preclude Evidence or Argument That Paying Bribes
     Is Common Practice in Ghana or the Energy Sector Generally............................... 46

IX.  The Court Should Preclude Evidence or Argument That the Defendant
     Was Extorted Into Paying Bribes............................................................................ 49

X.  The Court Should Preclude the Defendant From Arguing That He Did
     Not Obtain an Improper Business Advantage or Did Not Succeed in
     Obtaining or Retaining Business ............................................................................ 51

XI.  The Court Should Preclude the Defendant from Arguing that the
     Payments in this Case were for "Routine Governmental Action" Absent
     an Offer of Proof.................................................................................................... 53

XII.  The Court Should Preclude the Defendant From Offering Evidence or
     Argument Regarding his Family Background, Connections to the
     United States, and Other Similar Personal Factors ............................................... 56

XIII.  The Court Should Preclude Evidence or Argument Concerning Possible
     Punishment and Collateral Consequences ............................................................ 59

XIV.  The Court Should Order the Defendant to Disclose Rule 16(b)
     Discovery and Preclude Introduction of Exhibits Not Disclosed ........................... 60

XV.    The Government Provides Notice that It Will Seek to Admit Party-Opponent and Co-Conspirator Statements and Object to Them If Offered by the Defendant.................................................................................. 62

XVI.    The Court Should Admit the Defendant's Proffer Protected Statements at Trial If the Waiver Provision of the Proffer Agreement Is Triggered .............. 74

XVII.    The Court Should Permit the Government to Authenticate Certain Evidence Based on Fed. R. Evid. 902(13) and 902(14)........................................ 77

XVIII.  The Court Should Admit Certain Evidence Based on Fed. R. Evid. 902 and 18 U.S.C. § 3505 .............................................................................................. 81

CONCLUSION..................................................................................................................... 84

## TABLE OF AUTHORITIES

<u>CASES</u>

*23-34 94th St. Grocery Corp. v. New York City Bd. of Health*,
685 F.3d 174 (2d Cir. 2012) ........................................................................................ 9

*A.I Trade Finance, Inc. v. Centro Internationale Handelbank AG*,
926 F. Supp. 378 (S.D.N.Y. 1996) ........................................................................... 10

*Arista Recs. LLC v. Lime Grp. LLC*,
784 F. Supp. 2d 398 (S.D.N.Y. 2011) ..................................................................... 78

*Bourjaily v. United States*,
483 U.S. 171 (1987) ................................................................................................. 64

*Brooklyn Heights Ass'n, Inc. v. National Park Service*,
777 F. Supp. 2d 424 (E.D.N.Y. 2011) ..................................................................... 10

*Burnett v. United States*,
222 F.2d 426 (6th Cir. 1955) ................................................................................... 46

*Ding Lian Zou v. R. Gonzales*,
198 F. App'x 109 (2d Cir. 2006) ............................................................................... 9

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ........................................................................................ 9

*Funk v. Belneftekhim*,
No. 14-CV-0376 (BMC), 2018 WL 11169575 (E.D.N.Y. Nov. 30, 2018) ........................... 71

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 523 (E.D.N.Y. 2012) ..................................................................... 15

*Goldenberg v. United States*,
No. 04-CR-159 (NGG) (E.D.N.Y.), ECF Dkt. No. 364 ......................................... 76

*Goldenberg v. United States*,
No. 09-CV-4005 (NGG), 2012 WL 1599869 (E.D.N.Y. May 4, 2012) ............................. 76

*Kyles v. Whitley*,
514 U.S. 419 (1995) ....................................................................................... 39, 40, 41

*Martins v. 3PD, Inc.*,
No. 11-CV-11313, 2013 WL 1320454 (D. Mass. Mar. 28, 2013) ............................. 9

*McConaughey v. Port Auth. of New York & New Jersey*,
No. 21-CV-6137 (RA), 2025 WL 1927502 (S.D.N.Y. July 14, 2025) ..................... 56

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305 (2009) ................................................................................................. 79

iii

*In re Parmalat Sec. Litig.*,
477 F. Supp. 2d 637 (S.D.N.Y. 2007) ............................................................... 11

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*,
MDL No. 1358 (SAS), 2013 WL 6869410 (S.D.N.Y. Dec. 30, 2013) .................................. 10

*Qiu Yun Chen v. Holder*,
715 F.3d 207 (7th Cir. 2013) ............................................................... 10

*Rychorcewicz v. Welltec, Inc.*,
Civ. No. H-16-2, 2018 WL 3559131 (S.D. Tex. June 22, 2018) ..................................... 10, 11

*Shannon v. United States*,
512 U.S. 573 (1994) ............................................................... 59

*Smith v. United States*,
188 F.2d 969 (9th Cir. 1951) ............................................................... 46

*Sparf v. United States*,
156 U.S. 51 (1895) ............................................................... 23

*Town of Newton v. Rumery*,
480 U.S. 386 (1987) ............................................................... 44

*United States v. Adelekan*,
567 F. Supp. 3d 459 (S.D.N.Y. 2021) ............................................................... 50

*United States v. Aiyaswamy,*
No. 15-CR-568 (LHK), 2017 WL 1365228 (N.D. Cal. Apr. 14, 2017) ................................. 61

*United States v. Akinrosotu*,
637 F.3d 165 (2d Cir. 2011) ............................................................... 9

*United States v. Al Kassar*,
660 F.3d 108 (2d Cir. 2011) ............................................................... 48

*United States v. Alicea*,
837 F.2d 103 (2d Cir. 1988) ............................................................... 50

*United States v. Amato*,
15 F.3d 230 (2d Cir. 1994) ............................................................... 66

*United States v. Armstrong*,
517 U.S. 456 (1996) ............................................................... 43

*United States v. Arrington*,
867 F.2d 122 (2d Cir. 1989) ............................................................... 67

*United States v. Ashraf*,
320 F. App'x 26 (2d Cir. 2009) ............................................................... 64

*United States v. Baldeo,*
    No. 13-CR-125 (PAC), 2014 WL 6807833 (S.D.N.Y. Dec. 3, 2014) ............................. 19, 20

*United States v. Barrow,*
    400 F.3d 109 (2d Cir. 2005) ..................................................................... 75

*United States v. Battaglia,*
    No. 05-CR-774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) ................................ 57

*United States v. Berg*,
    710 F. Supp. 438 (E.D.N.Y. 1989) ................................................................ 46

*United States v. Bin Laden*,
    146 F. Supp. 2d 373 (S.D.N.Y. 2001) ............................................................ 18

*United States v. Birney*,
    686 F.2d 102 (2d Cir. 1982) ..................................................................... 22

*United States v. Black,*
     No. 13-CR-316 (DLI), 2014 WL 5783067 (E.D.N.Y. Nov. 5, 2014) .................................28

*United States v. Blake*,
    195 F. Supp. 3d 605 (S.D.N.Y. 2016) ............................................................ 70

*United States v. Blume*,
    967 F.2d 45 (2d. Cir. 1992) ..................................................................... 59

*United States v. Bout*,
    651 Fed. App'x 62 (2d Cir. 2016) ............................................................... 78

*United States v. Bray*,
    139 F.3d 1104 (6th Cir. 1998) .................................................................. 14

*United States v. Brooks*,
    681 F.3d 678 (5th Cir. 2012) ................................................................... 48

*United States v. Brookshire*,
    514 F.2d 786 (10th Cir. 1975) .................................................................. 46

*United States v. Brown*,
    293 F. App'x 826 (2d Cir. 2008) ................................................................ 17

*United States v. Carboni*,
    204 F.3d 39 (2d Cir. 2000) ..................................................................... 25

*United States v. Cardascia*,
    951 F.2d 474 (2d Cir. 1991) .................................................................... 71

*United States v. Carter,*
    No. 21-CR-681 (NSR), 2024 WL 268248 (S.D.N.Y. Jan. 24, 2024) .............................. 79, 80

*United States v. Carr*,
　424 F.3d 213 (2d Cir. 2005) ............................................................................... 23

*United States v. Catino*,
　735 F.2d 718 (2d Cir. 1984) ............................................................................... 20

*United States v. Chang,*
　No. 18-CR-681 (NGG), 2024 WL 3303717 (E.D.N.Y. July 3, 2024) ............................ 10, 24

*United States v. Citron*,
　783 F.2d 307 (2d Cir. 1986) ............................................................................... 15

*United States v. Colon*,
　880 F.2d 650 (2d Cir. 1989) ............................................................................... 26

*United States v. Concepcion*,
　983 F.2d 369 (2d Cir. 1992) ............................................................................... 25

*United States v. Davidson*,
　308 F. Supp. 2d 461 (S.D.N.Y. 2004) ................................................................... 72

*United States v. Desena,*
　260 F.3d 150 (2d Cir. 2001) ............................................................................... 65

*United States v. Dhinsa,*
　243 F.3d 635 (2d Cir. 2001) ............................................................................... 80

*United States v. Diaz*,
　176 F.3d 52 (2d Cir. 1999) ................................................................................. 65

*United States v. Donovan*,
　55 F. App'x 16 (2d Cir. 2003) ............................................................................. 65

*United States v. Duperval*,
　777 F.3d 1324 (11th Cir. 2015) ........................................................................... 54

*United States v. Duque*,
　123 F. App'x 447 (2d Cir. 2005) .......................................................................... 17

*United States v. Eisen*,
　974 F.2d 246 (2d Cir. 1992) ............................................................................... 67

*United States v. Ellis*,
　460 F.3d 920 (7th Cir. 2006) .............................................................................. 81

*United States v. Erwin*,
　602 F.2d 1183 (5th Cir. 1979) ........................................................................ 19, 20

*United States v. Fawwaz*,
　694 F. App'x 847 (2d Cir. 2017) .......................................................................... 64

*United States v. Feng*,
277 F.3d 1151 (9th Cir. 2002) ................................................................................ 20, 21

*United States v. Flores*,
538 F.2d 939–44 (2d Cir. 1976) ..................................................................................... 27

*United States v. Fowler*,
932 F.2d 306 (4th Cir. 1991) ......................................................................................... 46

*United States v. Fusco*,
No. 09-CR-1239 (PKC), 2011 WL 5116843 (S.D.N.Y. Oct. 27, 2011) ............................... 27

*United States v. Geaney*,
417 F.2d 1116 (2d Cir. 1969) ......................................................................................... 67

*United States v. Gentile*,
No. 21-CR-54 (RPK), 2024 WL 3046193 (E.D.N.Y. June 18, 2024) ................................... 13

*United States v. Germosen*,
139 F. 3d 120 (2d Cir. 1998) ......................................................................................... 26

*United States v. Giffen*,
379 F. Supp. 2d 337 (S.D.N.Y. 2004) ................................................................................. 62

*United States v. Gigante*,
166 F.3d 75 (2d Cir. 1998) ............................................................................................. 64

*United States v. Gonzales*,
407 F.3d 118 (2d Cir. 2005) ........................................................................................... 49

*United States v. Gonzalez*,
110 F.3d 936 (2d Cir. 1997) ........................................................................................... 25

*United States v. Goodwin*,
457 U.S. 368 (1982) ....................................................................................................... 43

*United States v. Grady*,
544 F.2d 598 (2d Cir.1976) ........................................................................................... 11

*United States v. Harris*,
491 F.3d 440 (D.C. Cir. 2007) ......................................................................................... 57

*United States v. Hassanshahi*,
185 F. Supp. 3d 55 (D.D.C. 2016) ................................................................................... 18

*United States v. Hatfield*,
685 F. Supp. 2d 320 (E.D.N.Y. 2010) ............................................................................. 28

*United States v. Herbert,*
No. 03-CR-211 (SHS), 2005 WL 106909 (S.D.N.Y. Jan. 19, 2005) ............................... 18, 19

vii

*United States v. Hill,*
No. 12-CR-214 (KAM), 2014 WL 198813 (E.D.N.Y. Jan. 14, 2014) .................................. 44

*United States v. Ho*,
984 F.3d 191 (2d Cir. 2020) ................................................................................................ 15

*United States v. Holden,*
No. 13-CR-444, 2015 WL 1514569 (D. Or. Mar. 19, 2015) .................................................. 61

*United States v. Hsia,*
No. 98-CR-0057 (PLF), 2000 WL 195067 (D.D.C. Jan. 21, 2000) ................................. 60, 61

*United States v. Ianniello*,
621 F. Supp. 1455 (S.D.N.Y. 1985) ....................................................................................... 67

*United States v. Inniss,*
No. 18-CR-134 (KAM), 2019 WL 6999912, (E.D.N.Y. Dec. 20, 2019) .............................. 47

*United States v. Inserra*,
34 F.3d 83 (2d Cir. 1994) .................................................................................................... 25

*United States v. Jadusingh,*
No. 18-CR-257 (KAM), 2020 WL 207950 (E.D.N.Y. Jan. 14, 2020) .................................. 59

*United States v. James,*
No. 02-CR-778 (SJ), 2007 WL 2702452 (E.D.N.Y. Sept. 12, 2007) .............................. 71, 73

*United States v. Jasper,*
No. 00-CR-825 (PKL), 2003 WL 223212 (S.D.N.Y. Jan. 31, 2003) .................................... 62

*United States v. Jefferson*,
215 F.3d 820 (8th Cir. 2000) ................................................................................................ 66

*United States v. Johnson*,
688 F.3d 494 (8th Cir. 2012) ................................................................................................ 81

*United States v. Kahale*,
789 F. Supp. 2d 359 (E.D.N.Y. 2009) ................................................................................... 67

*United States v. Kandic,*
No. 17-CR-449 (NGG), 2022 WL 1266431 (E.D.N.Y. Apr. 28, 2022) ............................... 82

*United States v. Kaufman*,
No. 19-CR-504 (LAK), 2021 WL 51521 (S.D.N.Y. Jan. 6, 2021) ...................................... 57

*United States v. Kay*,
359 F.3d 738 (5th Cir. 2004) ........................................................................................... 52, 54

*United States v. Kay*,
513 F.3d 432 (5th Cir. 2007) ................................................................................................ 47

*United States v. Kirk Tang Yuk,*
    885 F.3d 57 (2d Cir. 2018) ........................................................................ 17

*United States v. Komasa,*
    767 F.3d 151 (2d Cir. 2014) ...................................................................... 82

*United States v. Kozeny,*
    582 F. Supp. 2d 535 (S.D.N.Y. 2008) ................................................... 49, 52

*United States v. Labate,*
    No. 00-CR-632 (WHP), 2001 WL 533714 (S.D.N.Y. May 18, 2001) ................... 67

*United States v. Laden,*
    No. 98-CR-1023 (LBS), 2001 WL 276714 (S.D.N.Y. Mar. 20, 2001) ................... 78

*United States v. Lange,*
    834 F.3d 58 (2d Cir. 2016) ........................................................................ 17

*United States v. Larkin,*
    No. 12-CR-319 (JCM) (GWF), 2015 WL 4415506 (D. Nev. July 20, 2015) ......... 61

*United States v. Lasko,*
    146 F. App'x 530 (2d Cir. 2005) ................................................................. 15

*United States v. Lauersen,*
    No. 98-CR-1134 (WHP), 2000 WL 1693538 (S.D.N.Y. Nov. 13, 2000) ............. 56

*United States v. Levin,*
    No. 15-CR-101, 2016 WL 299031 (S.D.N.Y. Jan. 25, 2016) ............................. 48

*United States v. Levy,*
    731 F.2d 997 (2d Cir. 1984) ...................................................................... 26

*United States v. Lights,*
    2016 WL 7098633 (S.D.N.Y. Dec. 5, 2016) .................................................. 35

*United States v. Loadholt,*
    No. 24-CR-670 (LJL), 2025 WL 2962619 (S.D.N.Y. Oct. 21, 2025) ............. 19, 20

*United States v. Lozano-Reyes,*
    101 F.3d 686, 1996 WL 313934 at *2 (2d Cir. 1996) ...................................... 66

*United States v. Mahaffy,*
    No. 05-CR-613 (ILG), 2007 WL 1094153 (E.D.N.Y. Apr. 10, 2007) ................... 70

*United States v. Maldonado-Rivera,*
    922 F.2d 934 (2d Cir. 1990) ................................................................... 64, 65

*United States v. Malka,*
    602 F. Supp. 3d 510 (S.D.N.Y. 2022) ......................................................... 65

ix

*United States v. Marin,*
    669 F.2d 73 (2d Cir. 1982) .................................................................. 70, 72

*United States v. Mavashev,*
    No. 08-CR-902 (DLI), 2010 WL 670083 (E.D.N.Y. Feb. 23, 2010)(d) .............................. 62

*United States v. McDaniel,*
    398 F.3d 540 (6th Cir. 2005) .................................................................. 70

*United States v. McGowan,*
    58 F.3d 8 (2d Cir. 1995) .................................................................. 40

*United States v. McNair,*
    46 F. App'x 658 (2d Cir. 2002) .................................................................. 38

*United States v. Menendez,*
    No. 23-CR-490 (SHS), 2024 WL 2867107 (S.D.N.Y. June 4, 2024) .................................... 36

*United States v. Merchant,*
    No. 24-CR-362 (EK), 2026 WL 457435 (E.D.N.Y. Feb. 18, 2026) .................................... 78

*United States v. Mermelstein,*
    487 F. Supp. 2d 242 (E.D.N.Y. 2007) .................................................................. 67

*United States v. Michel,*
    879 F. Supp. 2d 291 (E.D.N.Y. 2012) .................................................................. 82

*United States v. Mickens,*
    926 F.2d 1323 (2d Cir. 1991) .................................................................. 26

*United States v. Miller,*
    641 F. Supp. 2d 161 (E.D.N.Y. 2009) .................................................................. 56

*United States v. Miller,*
     808 F.3d 607 (2d Cir. 2015)................................................................18, 19

*United States v. Morgan,*
    505 F.3d 332 (5th Cir. 2007) .................................................................. 81

*United States v. Morrissey,*
    895 F.3d 541–52 (8th Cir. 2018) .................................................................. 19

*United States v. Napout,*
    No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) .......................... 24, 61

*United States v. Natale,*
    526 F.2d 1160 (2d Cir. 1975) .................................................................. 78

*United States v. Nguyen,*
    507 F. App'x 64 (2d Cir. 2013) .................................................................. 19

*United States v. Ohle,*
 441 F. App'x 798 (2d Cir. 2011) ........................................................................ 17

*United States v. Oldbear,*
 568 F.3d 814 (10th Cir. 2009) ........................................................................... 48

*United States v. Ortiz,*
 857 F.2d 900 (2d Cir. 1988) .............................................................................. 26

*United States v. Paccione,*
 949 F.2d 1183 (2d Cir. 1991) ........................................................................... 57

*United States v. Paulino,*
 445 F.3d 211 (2d Cir. 2006) .............................................................................. 37

*United States v. Pendleton,*
 658 F.3d 299 (3d Cir. 2011) .............................................................................. 18

*United States v. Percoco,*
 No. 16-CR-776 (VEC), 2018 WL 9539131 (S.D.N.Y. June 14, 2018) ................................... 39

*United States v. Perez,*
 No. 05-CR-441 (PKL), 2005 WL 2709160 (S.D.N.Y. Oct. 20, 2005) ................................... 38

*United States v. Persico,*
 No. 04-CR-911 (SJ), 2006 WL 3246922 (E.D.N.Y. Nov. 8, 2006) ..................... 71, 73, 74, 75

*United States v. Pinto,*
 850 F.2d 927 (2d Cir. 1988) .............................................................................. 14

*United States v. Pitt-Des Moines, Inc.,*
 168 F.3d 976 (7th Cir. 1999) ............................................................................. 48

*United States v. Purcell,*
 967 F.3d 159 (2d Cir. 2020) .............................................................................. 17

*United States v. Qualls,*
 553 F. Supp. 2d 241 (E.D.N.Y. 2008) .................................................................. 83

*United States v. Qualls,*
 613 F. App'x 25 (2d Cir. 2015) ..................................................................... 79, 82

*United States v. Rahme,*
 813 F.2d 31 (2d Cir. 1987) ............................................................................... 66

*United States v. Ramsey,*
 No. 21-CR-495 (ARR), 2023 WL 2523193 (E.D.N.Y. Mar. 15, 2023) ................................ 44

*United States v. Rastelli,*
 870 F.2d 822 (2d Cir. 1989) .............................................................................. 66

*United States v. Ray,*
No. 20-CR-110 (LJL), 2022 WL 558146 (S.D.N.Y. Feb. 24, 2022) ..................................... 82

*United States v. Re,*
401 F.3d 828 (7th Cir. 2005) ............................................................................................... 44

*United States v. Rivera,*
22 F.3d 430 (2d Cir. 1994) .................................................................................................. 65

*United States v. Rivera,*
No. 13-CR-149, 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) ...................................... 48, 77

*United States v. Roberts,*
660 F.3d 149 (2d Cir. 2011) ................................................................................................ 76

*United States v. Rom,*
528 F. App'x 24 (2d Cir. 2013) ........................................................................................... 82

*United States v. Romano,*
No. 12-CR-691 (JFK), 2014 WL 69794 (E.D.N.Y Jan. 8, 2014) ......................................... 38

*United States v. Rosemond,*
958 F.3d 111 (2d Cir. 2020) .......................................................................................... 29, 33

*United States v. Royer,*
549 F.3d 886 (2d Cir. 2008) ................................................................................................ 17

*United States v. Russo,*
302 F.3d 37 (2d Cir. 2002) .................................................................................................. 65

*United States v. Rutigliano,*
790 F.3d 389 (2d Cir. 2015) ................................................................................................ 17

*United States v. Salerno,*
868 F.2d 524 (2d Cir. 1989) ................................................................................................ 66

*United States v. Schlesinger,*
372 F. Supp. 711 (E.D.N.Y. 2005) ...................................................................................... 66

*United States v. Schwartz,*
924 F.2d 410 (2d Cir. 1991) ................................................................................................ 46

*United States v. Shyne,*
617 F.3d 103 (2d Cir. 2010) ............................................................................................ 38-39

*United States v. Shyne,*
No. 05-CR-1067 (KMK), 2007 WL 1075035 (S.D.N.Y. Apr. 5, 2007) ............................... 67

*United States v. Silva,*
71 F.3d 667 (7th Cir. 1995) ................................................................................................. 40

*United States v. Simmons*,
    923 F.2d 934 (2d Cir. 1991) .................................................................................. 65

*United States v. Slapo*,
    285 F. Supp. 513 (S.D.N.Y. 1968) .................................................................. 46-47

*United States v. St. Rose,*
    No. 11-CR-349 (SJ), 2012 WL 1107659 (E.D.N.Y. Apr. 2, 2012) ....................... 57

*United States v. Sterritt,*
    No. 21-CR-193 (KAM), 2023 WL 7386660 (E.D.N.Y. Nov. 8, 2023) ................. 57

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006) .................................................................................. 66

*United States v. Stewart*,
    2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) .......................................................... 58

*United States v. Svoboda*,
    347 F.3d 471 (2d Cir. 2003) .................................................................................. 17

*United States v. Swenson*,
    298 F.R.D. 474 (D. Idaho 2014) ........................................................................... 61

*United States v. Tarantino*,
    846 F.2d 1384 (D.C. Cir. 1988) ........................................................................... 65

*United States v. Thai*,
    29 F.3d 795 (2d Cir. 1994) .................................................................................... 66

*United States v. Thomas*,
    116 F.3d 606 (2d Cir. 1997) .................................................................................. 23

*United States v. Tin Yat Chin*,
    371 F.3d 31 (2d Cir. 2004) .................................................................................... 80

*United States v. Tropeano*,
    252 F.3d 653 (2d Cir. 2001)...................................................................................80

*United States v. Tracy*,
    12 F.3d 1186 (2d Cir. 1993) .................................................................................. 67

*United States v. Tzolov*,
    642 F.3d 314 (2d Cir. 2011) .................................................................................. 17

*United States v. Ulbricht*,
    79 F. Supp. 3d 466 (S.D.N.Y. 2015) ..................................................................... 64

*United States v. Wagner*,
    103 F. App'x 422 (2d Cir. 2004) ........................................................................... 38

*United States v. Wainright,*
351 F.3d 816 (8th Cir. 2003) ............................................................................... 15

*United States v. Watts,*
934 F. Supp. 2d 451 (E.D.N.Y. 2013) ................................................................. 22

*United States v. Weeks,*
716 F.2d 830 (11th Cir. 1983) ............................................................................. 25

*United States v. Weiland,*
420 F.3d 1062 (9th Cir. 2005) ............................................................................. 81

*United States v. Weingarten,*
No. 19-CR-497 (NSR), 2024 WL 677995 (S.D.N.Y. Feb. 15, 2024) ................... 66

*United States v. Weiss,*
930 F.2d 185 (2d Cir. 1991) ................................................................................ 62

*United States v. White,*
692 F.3d 235 (2d. Cir. 2012) ............................................................................... 44

*United States v. Williams,*
589 F.2d 210 (5th Cir. 1979) ............................................................................... 18

*United States v. Yeley-Davis,*
632 F.3d 673 (10th Cir. 2011) ............................................................................. 81

*United States. v. Jackson,*
345 F.3d 59 (2d Cir. 2003) .................................................................................. 37

*Wayte v. United States,*
470 U.S. 598 (1985) ............................................................................................ 43

*Whitfield v. United States,*
543 U.S. 209 (2005) ............................................................................................ 18

## STATUTES

15 U.S.C. § 78dd-1 .................................................................................................... 53

15 U.S.C. § 78dd-2 ................................................................................................ 2, 51

18 U.S.C. § 371 .......................................................................................................... 2

18 U.S.C. § 1512(f) ................................................................................................... 20

18 U.S.C. § 1956 ..................................................................................... 18, 2, 6, 17

18 U.S.C. § 3237 ........................................................................................... 17, 18, 20

18 U.S.C. § 3238 ............................................................................... 16, 17, 18, 20, 21

18 U.S.C. § 3505 ........................................................................................ 2, 81, 82, 83

31 U.S.C. § 5314 ...................................................................................................... 27

31 U.S.C. § 1010.350......................................................................................................27

<u>RULES</u>

Fed. R. Crim. P. 7 .......................................................................................................... 19

Fed. R. Crim. P. 16 .........................................................................................................60

Fed. R. Evid. 104 ........................................................................................................... 34

Fed. R. Evid. 201 ............................................................................................................. 9

Fed. R. Evid. 401 ....................................................................................................... 21, 56

Fed. R. Evid. 402 ........................................................................................................... 34

Fed. R. Evid. 403 ........................................................................................................... 22

Fed. R. Evid. 404(b) ....................................................................................................... 24

Fed. R. Evid. 801 ...........................................................................................................63

Fed. R. Evid. 803 ........................................................................................................... 82

Fed. R. Evid. 806 ........................................................................................................... 37

Fed. R. Evid. 902 ........................................................................................................... 79

Fed. R. Evid. 1006 ..................................................................................................... 12, 13

<u>OTHER AUTHORITIES</u>

Weinstein's Federal Evidence ......................................................................................... 15

Ghana Criminal Offences Act, 1960, Act 29 ................................................................. 47

PRELIMINARY STATEMENT

The government respectfully moves the Court for in limine rulings in advance of trial in the above-captioned matter.  The government seeks the following rulings from the Court:

i.  admitting publicly-available official documents archived on Ghanaian government websites;

ii.  admitting summary charts pursuant to Federal Rule of Evidence 1006;

iii.  admitting evidence establishing venue under the "first brought" venue statute and precluding any improper arguments about venue;

iv.  permitting the government to introduce the evidence of the defendant's other acts as direct evidence of the charged crimes or, in the alternative, pursuant to Federal Rule of Evidence 404(b);

v.  precluding the defendant from re-litigating the motion to suppress and to dismiss;

vi.  precluding the defendant from impeaching the confidential source or cross-examining law enforcement witnesses about their purported failure to consider the confidential source's reliability;

vii.  precluding evidence or argument regarding the government's charging decisions and policies;

viii.  precluding evidence or argument that paying bribes is common practice in Ghana or the energy sector generally;

ix.  precluding evidence or argument that the defendant was extorted into paying bribes;

x.  precluding the defendant from arguing that he did not obtain an improper business advantage or did not actually succeed in obtaining or retaining business;

xi.  precluding the defendant from arguing that the payments in this case were for "routine governmental action" absent an offer of proof;

xii.  precluding the defendant from offering evidence or argument regarding his family background, connections to the United States, and other similar personal factors;

xiii.  precluding the defendant from offering evidence concerning possible punishment and collateral consequences; and

xiv.  ordering the defendant to disclose his discovery for any trial exhibits to be introduced during his case-in-chief by July 6, 2026, pursuant to Federal Rule of Criminal Procedure 16(b).

1

Additionally, the government provides notice of its intent to:

xv.     introduce party-opponent statements and certain co-conspirator statements and object to the defendant's admission of his own hearsay statements and the statements of his co-conspirators for their truth;

xvi.     introduce proffer-protected statements by defendant if the defendant elicits argument or evidence that contradicts his statements;

xvii.     authenticate extractions from the defendant's iCloud account and electronic devices using certifications pursuant to Federal Rules of Evidence 902(13) and 902(14); and

xviii.     authenticate domestic and foreign business records using certifications pursuant to Federal Rule of Evidence 902 and 18 U.S.C. § 3505.

The government will seek final rulings from the Court on the admissibility of such evidence at the appropriate time during trial.

<u>RELEVANT BACKGROUND</u>

The defendant is charged in a three-count indictment with conspiracy to violate the Foreign Corrupt Practices Act (the "FCPA"), 15 U.S.C. § 78dd-1 <u>et</u> <u>seq.</u>, in violation of 18 U.S.C. § 371 (Count One), violating the FCPA, contrary to 15 U.S.C. §§ 78dd-2 and 78ff(a) (Count Two), and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Three).

The charges arise out of the defendant's role in a scheme to bribe officials of the government of the Republic of Ghana to obtain favorable treatment for a Turkish power company (the "Turkish Energy Company"). The defendant was an Executive Director in the Investment Banking Division (the "IBD") of a U.S.-based financial institution (the "Bank"). Indictment ¶ 1. In or about November 2014, the defendant and another employee at the Bank began exploring the possibility that the Turkish Energy Company could build a power plant (the "Power Plant") in Ghana pursuant to an "emergency power agreement" or "EPA" with the Ghanaian Ministry of Power (the "MoP"). Indictment ¶¶ 15, 21. As a part of the deal, the Bank would arrange financing for the project, including through an approximately $190 million loan. Indictment ¶ 21.

2

Securing the EPA required approval from several Ghanaian government entities and instrumentalities, including MoP, the Ghanaian cabinet and parliament, the Electricity Company of Ghana, Ltd ("ECG"), the Ghana Grid Company Ltd ("GridCo"), and the Public Utilities Regulatory Commission ("Purc").  Indictment ¶ 15.

The defendant agreed to pay bribes to Ghanaian officials—including two senior officials at the MoP (identified in the indictment as "Ghana Official 1" and "Ghana Official 2")—to obtain the approvals necessary for the EPA.  Indictment ¶ 16.  The bribes were facilitated by several well-connected Ghanaian businessmen, including Co-Conspirator 1, Co-Conspirator 4, and a relative of the President of Ghana (the "Presidential Relative").  Indictment ¶¶ 16, 25.  The Turkish Energy Company provided funds or reimbursed the defendant, Co-Conspirator 1, and Co-Conspirator 4 for these bribes including through payments to a company referred to in the indictment as Ghana Consulting Company 2 and Ghana Consulting Company Employee.  Indictment ¶¶ 32, 47, 51.  Some of these funds were then transferred to the defendant's accounts as reimbursement.  Indictment ¶¶ 39, 48.

As a part of the scheme, the Turkish Energy Company also agreed to pay approximately $42 million over the life of the EPA to a company referred to in the indictment as Ghana Consulting Company 1, which was controlled by Co-Conspirator 1 and Co-Conspirator 4.  Indictment ¶ 42.  The co-conspirators used Ghana Consulting Company 1 and Ghana Consulting Company 2 to collect funds or reimbursement for bribes to Ghanaian officials and to make payments to themselves. Indictment ¶¶ 5–6.  For example, the co-conspirators also discussed a $5 million fee to be paid to Ghana Consulting Company 1 upon the execution of the EPA, which would be broken into milestone payments including three payments of $1.5 million each, including $1.5 million to be paid at the signing of the EPA.  Indictment ¶ 30.

3

For instance, on April 14, 2015, Co-Conspirator 1 sent a sham invoice for $500,000 from Ghana Consulting Company 2 to a senior employee at Turkish Energy Company ("Co-Conspirator 3").  Indictment ¶ 33.  A few days later, on April 19, 2015, Co-Conspirator 1 emailed Co-Conspirator 3, copying the defendant on his personal email account, asking that Co-Conspirator 3:

> "[k]indly arrange for the first 500k$ to be in Ghana this week. …
> The intended recipient is on my case. … Please make arrangements
> to have the 1.5m$ also here in Ghana no later than end of this week
> or early part of the following.  I am going to part with 250k$ to
> [Ghana Official 1] on the basis that I will receive the same in due
> course.  This will represent part payment to [Ghana Official 1] as
> discussed."

Indictment ¶ 33(a).  The next day, the Turkish Energy Company transferred $500,000 to an account held by Ghana Consulting Company 2.  Indictment ¶ 33(c).  Just a few days later, a team of Ghanaian officials visited Turkey to inspect equipment to be used by the Turkish Energy Company for the Power Plant.  Indictment ¶ 34.  The Ghanaian officials sent a favorable report to Ghana Official 1, who in turn provided their report to a high-ranking official in the Ghanaian MoP (the "Senior Ghana Official").  Indictment ¶ 34.

On May 12, 2015, the Senior Ghana Official signed the EPA on behalf of the Ghanaian Ministry of Power.  Indictment ¶ 36.  Less than a week later, on May 19, 2015, Co-Conspirator 1 sent another sham invoice for a $1.5 million milestone payment to a senior employee at the Turkish Energy Company ("Co-Conspirator 2").  Indictment ¶ 38.  On May 22, 2015, the Turkish Energy Company transferred $1.5 million in payment to Ghana Consulting Company 2.  Indictment ¶ 38.  In turn, on or about June 11, 2015, Ghana Consulting Company 2 transferred approximately $75,000 to a bank account controlled by the defendant in Ghana.  Indictment ¶ 39.

The EPA was ratified by the Ghanaian parliament in July 2015 and executed in August 2015.  Indictment ¶¶ 41, 43.

After the EPA was signed, the defendant and Co-Conspirator 1 requested reimbursement from the Turkish Energy Company for additional bribes paid to secure approval of the EPA.  Indictment ¶¶ 44–48.  Among other things, Co-Conspirator 1 explained that they had paid $20,000 in bribes to PURC officials, $20,000 to GridCo officials, $10,000 to Ghanaian Official 2, $45,000 in cash and expenses to the team of Ghanaian officials who visited Turkey in April 2015, and $46,000 to officials in Parliament.  Indictment ¶¶ 44–45.  Co-Conspirator 1 explained that "P[URC] have so far received 120k.  100k from u and 20k from Asante [the Defendant]. … Parliament was all paid by Asante [the Defendant].  He actually added another 10k on his last visit as he had promised this to the guys."  Indictment ¶ 45.  Co-Conspirator 2 agreed to pay $140,000 for the bribes, which was transferred by the Turkish Energy Company to an account in the name of Ghana Consulting Company Employee on September 4, 2015.  Indictment ¶ 47.  Thereafter, approximately $100,000 was transferred from Ghana Consulting Company Employee's account to the defendant.  Indictment ¶ 48.

In total, the defendant and the other conspirators paid at least $700,000 in bribes to Ghanaian officials.  Indictment ¶ 19.

The defendant and his co-conspirators concealed these bribe payments and Ghana Consulting Company 1's role from other employees at the Bank, including compliance personnel. The defendant used his personal email address to discuss the bribe payments with Co-Conspirator 1, Co-Conspirator 2, and Co-Conspirator 3.  See, e.g., Indictment ¶¶ 33, 45.  In June 2015, when employees at the Bank raised questions about these payments, Co-Conspirator 3 told them that Ghana Consulting Company 1 was a "local partner" and that their only tangible contribution was

5

helping with "local arrangements; i.e. housing, security, advisory on permitting, or other local goods and services …." Indictment ¶ 49. Likewise, in May 2016, Co-Conspirator 2 and Co-Conspirator 3 falsely told the Bank that Ghana Consulting Company 1 assisted with "local services" such as securing visas and car rentals, the same misleading explanation they had given to Bank employees who questioned the payments the year before. Indictment ¶ 52. Co-Conspirator 2 told the Bank that the Turkish Energy Company had paid the Ghana Consulting Company 1 $300,000 to date but did not mention that the Turkish Energy Company had paid more than $2 million to Ghana Consulting Company 1 and Ghana Consulting Company 2 or that the contract between Ghana Consulting Company 1 and the Turkish Energy Company provided for approximately $42 million in payments over the course of the EPA. Indictment ¶ 52. The Turkish Energy Company refused to provide additional information to the Bank about the arrangement with Ghana Consulting Company 2. Id.

The Bank ultimately did not provide financing for the Power Plant, and, on March 6, 2017, the defendant left the Bank. Indictment ¶¶ 55–56.

A grand jury sitting in this district returned the Indictment on August 26, 2020. On November 3, 2022, the defendant was arrested at London Heathrow Airport in the United Kingdom. On July 15, 2024, following proceedings in the United Kingdom, the defendant was extradited to this district, arriving at John F. Kennedy International Airport in Queens. On July 16, 2024, he was arraigned before Magistrate Judge Lois Bloom and released on bond with the consent of the government. ECF No. 10.

6

<u>ARGUMENT</u>

I.    <u>The Court Should Admit Publicly Available Documents Archived on Ghanaian Government Websites</u>

The government respectfully moves <u>in</u> <u>limine</u> to admit the following materials, including Republic of Ghana government documents, which are archived and publicly available on the Parliament of Ghana Library Repository (the "Repository") website, and information found on a website of the Ghana Grid Company Limited ("GridCo"), a private limited liability company wholly-owned by the Government of Ghana ("GoG").  As explained below, the Court can take judicial notice of documents maintained on foreign governmental websites pursuant to Federal Rule of Evidence 201.  These documents are also self-authenticating pursuant to Federal Rule of Evidence 902(5), and may be admitted for their truth as they fall within the hearsay exception for public records set forth in Federal Rule of Evidence 803(8):

- The Budget Statement and Economic Policy of the Government of Ghana for the 2016 Financial Year, November 13, 2015, https://repository.parliament.gh/server/api/core/bitstreams/20daf46b-4659-4e7b-ae9d-42e89e952629/content.  GX -7037.

- Memorandum to Parliament by Minister for Finance: Request for Waiver of Import Duties, Approved Taxes and Levies for the 370MW [Turkish Energy Company] Power Project Under a Government of Ghana Contract with [Turkish Energy Company], June 19, 2018, https://repository.parliament.gh/server/api/core/bitstreams/a839b529-0798-4be6-9a96-37debe160f98/content.  GX-7038.

- Executive Instrument   (E.I.) 134, Civil Service (Ministries) Amendment Instrument, November 21, 2014, https://repository.parliament.gh/server/api/core/bitstreams/38f93c15-af00-4100-a33f-857313ebe049/content.  GX-7039.

- State of the Nation Address, February 26, 2015. https://repository.parliament.gh/items/68501c7a-5dd5-49c1-b9b5-2ae2bb3a89d6/full.  GX-7040.

- Report of the Finance Committee on the Request for Waiver of Import Duties, Import VAT, Import NHIL ECOWAS Levy, EXIM Levy, Special Import Levy and Other Approved Imposts Amounting to the Ghana Cedi Equivalent of Twenty-Seven Million, Two Hundred and Eight Thousand, Seven Hundred and Ninety-Four United States Dollard (SU$27,208,794.00) on Project Equipment and

7

Materials Under the Emergency Power Agreement Between the Government of the Republic of Ghana  and [[Turkish Energy Company] for the Provision on a Fast-Track Basis, Up to 370MW (ISO) Installed Capacity of Power Delivery Services, June 26, 2018, https://repository.parliament.gh/server/api/core/bitstreams/413ca528-0f94-436f-8f97-37db30fe48d5/content.  GX-7041.

- Memorandum to Parliament by Hon. Dr. Kwabena Donkor (Minister for Power) Subject: Emergency Power Agreement with Attached Annexes Between the Government of Ghana (Ministry of Power) and [Turkish Energy Company] for the Provision on a Fast-Track Basis, Up to 370MW (ISO) Installed Capacity of Power Delivery Services, June 15, 2015, https://repository.parliament.gh/items/e3d97b6b-972b-4175-bc7c-86f7d2d10392/full.  GX-7042.

- Public Utilities Regulatory Commission Act, 1997 (Revised Edition), https://repository.parliament.gh/server/api/core/bitstreams/309e76f4-67ff-4798-abd3-86bb4ae9c8f7/content.[1]  GX-7043.

- Report of the Committee on Mines & Energy on the Annual Budget Estimates of the Ministry of Energy and Petroleum for the 2015 Fiscal Year, December 2014, https://repository.parliament.gh/items/e70e80fa-312b-4448-9847-990124831c72/full.  GX-7044.

- Report of the Committee on Mines & Energy on the Emergency Power Agreement Between the Government of the Republic of Ghana, Represented by the Ministry of Power and [Turkish Energy Company] for the Provision on a Fast-Track Basis, Up to 370MW (ISO) Installed Capacity of Power Delivery Services, July 2015, https://repository.parliament.gh/server/api/core/bitstreams/f36da8c4-ff4e-4dec-b232-5fbedd42a052/content.  GX-7045.

- Energy Commission Act, 1997 (Act 541), Energy Commission (Amendment) Act, 2016 (Act 933), https://repository.parliament.gh/server/api/core/bitstreams/a1b48459-00ce-4115-bf1f-ecbded51f741/content.[2]  GX-7029.

- Ghana Grid Company Limited (GridCo) CE Message, in three screenshots, https://gridcogh.com/ce-message/.  GX-7030, 7131, 7032.

---

[1] This act can also be found on Parliament's main site at https://www.parliament.gh/docs?type=Acts&OT.

[2] The preceding ten documents were viewed on the Repository website on May 18, 2026 by Federal Bureau of Investigation Special Agent Ryan Collins.

- GridCo 2015 Annual Report, https://gridcogh.com/wp-content/uploads/2025/06/2015-Annual-Report-RV.-1-Final-for-AGM.pdf.[3]    GX-7028.

A.    Applicable Law

Under Rule 201(b)(2) of the Federal Rules of Evidence, the Court may take judicial notice of a fact not subject to dispute because it "can be readily determined from accurate sources." In recent decisions, the United States Court of Appeals for the Second Circuit has taken judicial notice of facts and materials published on websites.  See, e.g., Force v. Facebook, Inc., 934 F.3d 53, 59 n.5 (2d Cir. 2019) (taking judicial notice of Facebook's public terms of service and community standards); 23-34 94th St. Grocery Corp. v. New York City Bd. of Health, 685 F.3d 174, 183 n.7 (2d Cir. 2012) ("We take judicial notice of a poster recently published on TobaccoFreeNYS.org."); United States v. Akinrosotu, 637 F.3d 165, 168 (2d Cir. 2011) (taking judicial notice of www.bop.gov, the official website for the Bureau of Prisons, to determine defendant's release date).  Courts have also taken judicial notice of the contents of internet archives.  See Martins v. 3PD, Inc., No. 11-CV-11313, 2013 WL 1320454, at *16 n.8 (D. Mass. Mar. 28, 2013) (taking judicial notice of "the various historical versions of a website available on the Internet Archive at Archive.org as facts readily determinable by resort to a source whose accuracy cannot reasonably be questioned.").

The Second Circuit has taken judicial notice of foreign government evidence under Rule 201, including the content of administrative decisions from government administrations.  See Ding Lian Zou v. R. Gonzales, 198 F. App'x 109, 110 (2d Cir. 2006) (taking judicial notice of administrative decisions from local and provincial government administrations in China).  In a

---

[3]    The preceding two items were viewed on GRIDCo's website on June 5, 2026 by Special Agent Collins.

9

recent decision from this district, Judge Garaufis took judicial notice of an official decision by the Constitutional Council of the Republic of Mozambique that was published on the Council's official website and later found archived pursuant to Rule 201.  See United States v. Chang, No. 18-CR-681 (NGG), 2024 WL 3303717, *16-17 (E.D.N.Y. July 3, 2024) (holding that Rule 201 "extends to criminal judgments in other cases, including foreign judgments, where the court may take judicial notice of the judgment to establish the fact of such litigation, but not to prove the truth of the matters asserted in that litigation"); see also A.I Trade Finance, Inc. v. Centro Internationale Handelbank AG, 926 F.Supp. 378, 387 (S.D.N.Y. 1996) (collecting cases where courts took judicial notice of foreign judgments).

Evidence taken from government websites, including foreign government websites, is self-authenticating under Rule 902(5).  See Qiu Yun Chen v. Holder, 715 F.3d 207, 212 (7th Cir. 2013) (a document posted on a Chinese government website is presumptively authentic if government sponsorship can be verified by visiting the website itself.); see also In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig., MDL No. 1358 (SAS), 2013 WL 6869410, *4 (S.D.N.Y. Dec. 30, 2013) (vacated in part on other grounds) ( "Courts routinely take judicial notice of data on government websites because it is presumed authentic and reliable."); Brooklyn Heights Ass'n, Inc. v. National Park Service, 777 F. Supp. 2d 424, 432 n.6 (E.D.N.Y. 2011) (taking judicial notice of a city park website); Rychorcewicz v. Welltec, Inc., Civ. No. H-16-2, 2018 WL 3559131, *7 (S.D. Tex. June 22, 2018) (holding that "[i]t is well-settled that information found on government websites is self-authenticating under" Rule 902(5))

Courts have applied Rule 803(8) to public records of foreign governments, finding them an exception to the hearsay rule.  For instance, in a 2007 Southern District of New York decision, Judge Kaplan held that "Rule 803(8) is available to reports of foreign public offices and

10

agencies that otherwise come within its terms."  In re Parmalat Sec. Litig., 477 F. Supp. 2d 637, 640 (S.D.N.Y. 2007); see also United States v. Grady, 544 F.2d 598, 604 (2d Cir.1976) (applying Rule 803(8) to foreign documents); Rychorcewicz, 2018 WL 3559131 at *7 (finding that printouts from government websites come under the public records exception to the hearsay rule").

B.      Discussion

The Parliament of Ghana maintains an Institutional Repository available at https://repository.parliament.gh/home.  The Repository states that it is "an open access electronic archive for collecting, preserving, and sharing" materials created, owned or hosted by the Ghanaian Parliament.  The Repository is linked to the official Parliament of Ghana Library website at https://library.parliament.gh/services.php, under the "Digital Resources" tab, which is, in turn, linked to the official Parliament of Ghana website at https://www.parliament.gh/, under the "MPS & Offices" tab.

GridCo maintains a website at https://gridcogh.com. The website includes Annual Reports and information regarding the formation and nature of the entity.

The materials are relevant to show the approval of the Power Plant by the Parliament of Ghana, official acts taken by various GoG officials related to approval of the Power Plant, and the status of certain entities as instrumentalities of the Ghanaian government.  For instance, GX-7044 and GX-7045 are reports by Parliamentary committees related to approval of the EPA for the Power Plant in July 2015, which describe the information provided by Ministry of Power officials.  GX-7043 is the enabling statute for the Purc and is relevant to show that Purc was an instrumentality of the Ghanaian government.  Likewise, GX-7030 provides background on Gridco, including its ownership, control, and function, relevant to Gridco's status as an instrumentality of the Ghanaian government.

For the foregoing reasons, the Court should take judicial notice of the twelve items

11

described above, which are available on the Parliament of Ghana Library Repository and GridCo websites, and find that they are self-authenticating and may be admitted for their truth as they fall within a hearsay exception.

II.     The Court Should Admit Summary Charts Pursuant to Fed. R. Evid. 1006

The government anticipates calling Michael Petron at trial to testify regarding financial transactions related to each of the charges in the indictment.  Mr. Petron is a Managing Director with Stout Risius Ross, LLC ("Stout"), a global investment bank and advisory firm specializing in corporate finance, valuation, financial disputes, and investigations.  Mr. Petron will testify that he reviewed the bank records cited in his summary charts and prepared charts to identify certain, relevant financial transfers from the bank records, including, for instance, between Turkish Energy Company and Ghana Consulting Company 1 and Ghana Consulting Company 2 and transfers between those companies and Ghana Consulting Company Employee and the defendant and the other conspirators.  Mr. Petron is expected to testify that he has reviewed each of the exhibits cited in the slides and that the slides display a fair and accurate summary of information contained in those exhibits.  A draft of Mr. Petron's proposed summary exhibits is attached as Exhibit A to this motion.[4]

Federal Rule of Evidence 1006 ("Rule 1006") provides that a party "may use a summary, chart, or calculation to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been

---

[4]     Mr. Petron's summary charts have also been disclosed to the defendant as GX-8000.  The underlying bank records have also been disclosed to the defendant in discovery and as trial exhibits.  The government respectfully requests permission to file Exhibits A-C, F-Q and S under seal. These exhibits reference the names of uncharged third parties, unindicted co-conspirators and potential witnesses from these materials. See United States v. Amodeo, 71 F.3d 1044, 1048–50 (2d Cir. 1995).

12

introduced into evidence." Fed. R. Evid. 1006(a).  While the underlying admissible records need not be actually admitted, the "proponent must make the underlying originals or duplicates available for examination or copying, or both, . . . ." Fed. R. Evid. 1006(b).  "A summary must of course be based on foundation testimony connecting it with the underlying evidence summarized and must be based upon and fairly represent competent evidence already before the Court." United States v. Gentile, No. 21-CR-54 (RPK), 2024 WL 3046193, at *1 (E.D.N.Y. June 18, 2024) (quoting United States v. Neumann, No. 21-CR-439 (NSR), 2023 WL 8700974, at *7 (S.D.N.Y. Dec. 14, 2023).  The use of summary charts to "draw the jurors' attention to particular evidence culled from a voluminous set of records," has been "regularly reaffirmed" by the Second Circuit.  United States v. Yousef, 327 F.3d 56, 157–58 (2d Cir. 2003) (telephone summary charts were properly used to highlight patterns of phone calls); see also United States v. Lee, 660 F. App'x 8, 19 (2d Cir. 2016); United States v. Parnas, No. 19-CR-725 (JPO), 2022 WL 669869, at *7 (S.D.N.Y. Mar. 7, 2022), aff'd sub nom. United States v. Kukushkin, 61 F.4th 327 (2d Cir. 2023).  The Second Circuit "ha[s] regularly affirmed the use of such charts." Gentile, 2024 WL 3046193, at *1 (quoting United States v. Blackwood, 366 F. App'x 207, 212 (2d Cir. 2010)).

The Court should permit the government to introduce Mr. Petron's summary charts pursuant to Rule 1006.  Courts in this district have regularly permitted the government to introduce similar charts summarizing relevant transactions, including charts prepared by Mr. Petron in FCPA cases.  In United States v. Aguilar, Judge Vitaliano admitted summary charts prepared by Mr. Petron to summarize bribe payments in an FCPA and money laundering conspiracy.  See No. 20-CR-390 (ENV) (E.D.N.Y.), Trial Tr. 3124:3–9 (admitting Mr. Petron's non-expert flow of funds charts into evidence under Rule 1006); see also No. 20-CR-390 (ENV), Feb. 5, 2024 Minute Order (E.D.N.Y. Feb. 5, 2024) (denying defendant's motion to preclude Mr. Petron's summary slides).

13

In Gentile, Judge Kovner admitted Mr. Petron's summary charts summarizing cash flows between a series of accounts bank accounts controlled by the defendants.  Gentile, 2024 WL 3041693, at *2–*3.  Courts in this district routinely permit such testimony.  See, e.g., United States v. Small, No. 16-CR-640 (BMC) (E.D.N.Y.), Trial Tr. 1021:24-1022:3 (admitting charts prepared by non-expert Stout forensic accountant regarding flow of funds analysis into evidence as summary exhibit); United States v. Ng, No. 18-CR-538 (MKB) (E.D.N.Y. Mar. 14, 2022), ECF Dkt. No. 253 at Tr. 2838-2839 (admitting into evidence summary charts prepared by non-expert forensic accountant tracing bribe payments through various accounts); United States v. Barayev, No. 18-CR-318 (ERK) (E.D.N.Y. Feb. 25, 2020), ECF Dkt. No. 77 at Tr. 299–300 (admitting summary charts prepared by Mr. Petron in evidence).

The charts prepared by Mr. Petron in this case are materially indistinguishable from the charts he presented in Aguilar and should be admitted.[5]  As in Aguilar (and the other cases cited above), Mr. Petron will testify that he reviewed the underlying bank records to identify relevant transactions.  Those underlying bank records—which are hundreds if not thousands of pages—are admissible and have been produced to the defendant, satisfying the prerequisites of Rule 1006.  Mr. Petron then prepared summary charts which show the flow of funds across bank accounts in the relevant transactions.  For instance, from the Turkish Energy Company to Ghana

---

[5]    When summary charts are admitted into evidence, courts typically require a limiting instruction "'that the summary is not independent evidence of its subject matter, and is only as valid and reliable as the underlying evidence it summarizes.'"  6 WEINSTEIN'S FEDERAL EVIDENCE § 1006.04 (quoting United States v. Bray, 139 F.3d 1104, 1112 (6th Cir. 1998)); see also United States v. Pinto, 850 F.2d 927, 935 (2d Cir. 1988) (affirming "court's decision to allow the properly admitted summary charts into the jury room during deliberations" where "court repeatedly reminded the jurors of their responsibility to determine whether the charts accurately reflected the evidence presented").  The government will propose a similar instruction in this case based on the charge given by Chief Judge Brodie in United States v. Ng.  See No. 18-CR-538 (MKB) (E.D.N.Y.), ECF Dkt. No. 199 at 15–16.

Consulting Company 2 and then ultimately to accounts controlled by the defendant and Co-Conspirator 1. See, e.g., Ex. A at 3.

To the extent the Court finds that some of Mr. Petron's charts are not Rule 1006 summary evidence, but rather demonstratives or a combination of the two, courts have repeatedly found that such "hybrid" charts may be admitted into evidence "to assist the jurors" as long as the charts "'accurately and reliably summarize[] complex or difficult evidence.'"  6 WEINSTEIN'S FEDERAL EVIDENCE § 1006.04 (2019) (quoting United States v. Kerley, 784 F.3d 327, 341 (6th Cir. 2015)).  These charts "may include assumptions and conclusions" where "said assumptions and conclusions [are] based upon evidence in the record." United States v. Wainright, 351 F.3d 816, 821 (8th Cir. 2003).  And while the proponent of a chart must provide "enough explanation to allow the jury to see how the [data] on a chart were derived from the underlying evidence," the proponent need not "provide detailed testimony stating the basis of each" particular entry on the chart. United States v. Citron, 783 F.2d 307, 317 (2d Cir. 1986).

The Second Circuit "has long approved the use of charts in complex trials, and has allowed the jury to have the charts in the jury room during its deliberations, so long as the judge properly instructs the jury . . . that it is not to consider the charts as evidence." United States v. Ho, 984 F.3d 191, 210 (2d Cir. 2020) (quoting United States v. Casamento, 887 F.2d 1141, 1151 (2d Cir. 1989)); United States v. Lasko, 146 F. App'x 530, 532 (2d Cir. 2005) ("The use of charts summarizing evidence 'is a common procedure whose use [the Circuit] ha[s] repeatedly approved.'" (quoting United States v. Conlin, 551 F.2d 534, 538 (2d Cir. 1977))); see also Gill v. Arab Bank, PLC, 893 F. Supp. 2d 523, 536 (E.D.N.Y. 2012) (Cogan, J.) ("The charts will streamline the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion.").

15

III.     The Court Should Allow the Government to Introduce Evidence
         Establishing Venue Under the First Brought Venue Statute and Preclude
         Any Improper Arguments About Venue

The government moves in limine to be permitted to introduce evidence that establishes venue under the first brought venue statute, 18 US.C. § 3238. Here, as the Court is aware, the defendant was extradited from the United Kingdom in July 2024. When the defendant was extradited, he was first brought to the United States and the Eastern District of New York when he landed at John F. Kennedy International Airport in Queens ("JFK Airport") on July 15, 2024. Evidence the government intends to introduce at trial establishing venue under this provision includes, inter alia, the testimony of U.S. Marshals who escorted the defendant on his flight from London to JFK Airport and flight and immigration records.[6] The government respectfully requests a ruling in advance of trial that such evidence is relevant and admissible to prove venue under Section 3238 provides. The government makes this request now because its proof on venue will vary depending on whether it will proceed on § 3238 and/or another venue theory and a ruling from the Court may afford opportunities for the government to streamline its case-in-chief. As set forth below, the government need not allege venue pursuant to Section 3238 in the indictment to proceed on such a theory at trial. Based on the defendant's objections to the government's proposed jury charge, however,[7] it is apparent that the defendant disagrees. Resolution of this issue also therefore implicates whether the government will obtain a superseding indictment prior to trial.

---

[6]     The defendant's flight was direct from London to JFK Airport and made no stops in the United States before arriving at JFK Airport.

[7]     The government provided the defendant with notice that it would proceed on a "first brought" theory by letter on May 11, 2026, and again through the government's requests to charge.

16

Relatedly, the government moves to preclude arguments from the defendant that his case should have been brought in a different venue, or outside of the United States, for example, in the United Kingdom or in Ghana.  Such arguments are highly improper and invite jury nullification.  This is particularly salient here where venue should be factually undisputed as the defendant was first brought to the Eastern District of New York.  See 18 U.S.C. § 3238.

A.      18 U.S.C. § 3238 Lays Venue in This District

It is well-settled that while the government bears the burden of proving venue, it "need only establish it by a preponderance of the evidence."  United States v. Purcell, 967 F.3d 159, 186 (2d Cir. 2020).  In this case, the government can establish that venue is appropriate in this District in several ways.  For instance, the government can lay venue for Counts One and Two, the FCPA charges, pursuant to 18 U.S.C. § 3237(a), by proving that some act in furtherance of the offense took place in this District.[8]  See United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003) ("[V]enue is proper in any district in which an overt act in furtherance of [a] conspiracy was committed by any of the coconspirators.").  The government may lay venue for Count Three, the money laundering conspiracy, pursuant to 18 U.S.C. § 1956(i), which provides that venue is proper, inter alia, in "any district in which the financial or monetary transaction is conducted," 18

---

[8]      Under this theory, the government can prove venue in several different ways.  For example, venue is proper in any district where electronic communications are sent or received.  See, e.g., United States v. Lange, 834 F.3d 58, 70 (2d Cir. 2016); United States v. Royer, 549 F.3d 886, 895 (2d Cir. 2008).  Venue is also appropriate in any district through which electronic communications including wire transfers are routed.  See, e.g., United States v. Rutigliano, 790 F.3d 389, 397 (2d Cir. 2015) ("Defendants concede that venue lies where a wire in furtherance of a scheme begins its course, continues or ends."); United States v. Brown, 293 F. App'x 826, 829 (2d Cir. 2008); United States v. Ohle, 441 F. App'x 798, 802 (2d Cir. 2011).  In addition, courts in this Circuit have routinely found that passing through a district is sufficient to confer venue.  See, e.g., United States v. Kirk Tang Yuk, 885 F.3d 57, 71–72 (2d Cir. 2018); United States v. Tzolov, 642 F.3d 314, 320 (2d Cir. 2011); United States v. Duque, 123 F. App'x 447, 449 (2d Cir. 2005).

17

U.S.C. § 1956(i)(1)(A), or in any district "where an act in furtherance of the attempt or conspiracy took place," 18 U.S.C. § 1956(i)(2).  The government may also establish venue under 18 U.S.C. § 3238 because the government can prove that the alleged acts were "begun" or "committed" outside of the United States and the defendant was "first brought" to this District. [9]  See 18 U.S.C. § 3238.

With respect to the latter approach, the Second Circuit has held that § 3238 venue is appropriate where the offense was "begun" outside the United States but then came "within our country's borders."  See Miller, 808 F.3d at 619; United States v. Bin Laden, 146 F. Supp. 2d 373, 381 (S.D.N.Y. 2001) ("[S]ection 3238 is an appropriate basis for venue so long as the international conspiracy offense in question began outside the United States, irrespective of the fact that a few of the alleged overt acts of the conspiracy were later committed inside the United States"); see also United States v. Pendleton, 658 F.3d 299, 305 (3d Cir. 2011) (also finding prosecution in Delaware was proper under Section 3238 even when some of a defendant's offense conduct takes place in

---

[9]    The fact that Section 3238 is sufficient to establish venue in this District does not preclude the government from relying on other bases to establish venue at trial.  Where the government can establish venue under both 18 U.S.C. §§ 3237(a) and 3238, as is the case here, the Second Circuit in Miller has made clear that the venue provisions are not mutually exclusive.  See Miller, 808 F.3d at 620 ("[W]e do not think that venue becomes improper under § 3238 simply because it might also have been properly laid elsewhere pursuant to § 3237(a)"); accord United States v. Williams, 589 F.2d 210, 213 (5th Cir. 1979) ("The venue statutes are not mutually exclusive, and a suggestion that venue is proper under § 3237(a) will not serve to divest venue from another judicial district if venue is proper in that district under § 3238."), adopted in pertinent part, 617 F.2d 1063, 1071 (5th Cir. 1980) (en banc); United States v. Hassanshahi, 185 F. Supp. 3d 55, 58 (D.D.C. 2016) ("every court that the Court is aware of to have considered the issue has concluded that § 3238 is not a mandatory exception to § 3237(a). Both sections have been described as 'generic venue-laying statutes' that 'serve in some measure to provide a default basis for setting venue'" (quoting Miller, 808 F.3d at 614)).  The same is true for the specific money laundering venue provision in 18 U.S.C. § 1956(i).  See Whitfield v. United States, 543 U.S. 209, 217–18 (2005) ("Although we need not definitively construe [§ 1956(i)] here, we note that its language appears permissive rather than exclusive — § 1956(i) says a conspiracy prosecution 'may be brought' in a district meeting the specified criteria . . . .This suggests that the provision serves to supplement, rather than supplant, the default venue rule.").

18

the United States); <u>United States v. Herbert</u>, No. 03-CR-211 (SHS), 2005 WL 106909, at *1 (S.D.N.Y. Jan. 19, 2005) (explaining that § 3238 jury charge was correct because the "underlying conspiracy began-and all of [the defendant's] conduct related to the offense occurred-outside the United States"). <u>Miller</u> also holds that § 3238 applies to offenses that started inside the United States but that "are in their essence committed abroad." <u>See</u> <u>Miller</u>, 808 F.3d at 619.

There is no requirement that an indictment cite every appropriate basis for venue, and the Indictment here does not cite § 3238.[10]  Rule 7 requires only that the indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense . . . ."  Fed. R. Crim. P. 7(c).  Indeed, an indictment need not reference any venue provision whatsoever.  <u>See</u> <u>United States v. Baldeo</u>, No. 13-CR-125 (PAC), 2014 WL 6807833, at *3 (S.D.N.Y. Dec. 3, 2014) ("Since venue requirements are not elements of a crime, they do not need to be set forth in an indictment."); <u>United States v. Loadholt</u>, No. 24-CR-670 (LJL), 2025 WL 2962619, at *3 (S.D.N.Y. Oct. 21, 2025) ("Nor was it necessary for the United States to include reference [in the indictment] to any venue statute at all . . . .").  And because venue is not an element of the offense, the government does not constructively amend an indictment by proving venue on a theory different from the basis for venue cited in the indictment.  <u>See</u> <u>Baldeo</u>, 2014 WL 6807833, at *3 (rejecting argument that the government constructively amended an indictment by proving venue on an uncharged theory); <u>see also</u> <u>United States v. Nguyen</u>, 507 F. App'x 64, 66 (2d Cir. 2013) (rejecting the argument that a change in venue theory at trial was a prejudicial

---

[10]     This makes sense because it may not be possible to predict that § 3238 will apply at the time the grand jury returns the indictment.  In that situation, the government may obtain a superseding indictment alleging that venue is also proper under § 3238, but as we explain here, it is not required to do so.  In the event the Court denies the government's motion <u>in limine</u>, the government is prepared to seek a superseding indictment that would allege that venue is proper under § 3238.

variance); United States v. Morrissey, 895 F.3d 541, 551–52 (8th Cir. 2018); see also United States v. Erwin, 602 F.2d 1183, 1185 (5th Cir. 1979).  Thus, in Baldeo, the government proved venue was proper in an obstruction case under the specific venue provision set forth in 18 U.S.C. § 1512(f) even though the indictment did not mention Section 1512(f).  2014 WL 6807833, at *3. And in United States v. Loadholt, the government was permitted to establish venue pursuant to Section 3237 even though the indictment contained citations only to Section 3238.  See 2025 WL 2962619, at *2–*3 (holding that "The Indictment also is not defective for its failure to mention Section 3237 in the parenthetical; where a statute is highlighted in a parenthetical, it is merely 'emphasized.'" (quoting United States v. Kleinman, 19 F.R.D. 423, 424 (E.D.N.Y. 1956))).

Based on the facts of this case, the government respectfully submits that it is legally proper to proceed on § 3238 as one basis among several or as the sole basis for venue.  First, while the government intends to argue that certain acts of the conspiracy affected and were committed in the United States, including in this District, there is no serious dispute that the offenses alleged in Counts One and Two were "begun" and were "committed" outside the United States such that § 3238 applies.  For example, the evidence will show that the defendant was working in London in 2014 when the conspiracy was formed.  Likewise, the other participants in the conspiracy were based in London, Turkey, and Ghana.

Second, the government can also prove by a preponderance of evidence that the defendant was "first brought" to this District when he landed at JFK Airport upon his extradition to the United States.  Courts have defined the term "first brought" to mean the U.S. jurisdiction to which a person is brought from outside the United States in custody.  See, e.g., United States v. Catino, 735 F.2d 718, 724 (2d Cir. 1984) ("'[F]irst brought' . . . applies only in situations where the offender is returned to the United States already in custody."); United States v. Feng, 277 F.3d

20

1151, 1155 (9th Cir. 2002) ("The word 'brought' under the statute means 'first brought into a jurisdiction [from outside the United States' jurisdiction] while in custody.'" (alteration in original) (quoting United States v. Liang, 224 F.3d 1057, 1061 (9th Cir. 2000)).

Thus, the government respectfully requests that the Court rule that evidence establishing that the defendant was "first brought" to the Eastern District of New York is relevant and admissible to prove venue pursuant to § 3238. Such a ruling would allow the government to streamline its venue-related evidence at trial. For example, in Bin Laden, Judge Leonard B. Sand in the Southern District of New York decided that submitting 18 U.S.C. § 3238 as the sole basis upon which the jury could determine venue for the charged conduct was appropriate because it streamlined the jury's deliberative task and minimized the risk of danger of confusion to the jury and prejudice to the defendants in that case. See Bin Laden, 146 F. Supp. 2d at 382.

B.   The Defendant Should Not Be Permitted To Argue That He Should Be Prosecuted Somewhere Else Other Than This District.

The government also moves to preclude the defendant from eliciting evidence or arguing to the jury that this case should be more appropriately brought somewhere else, including in another country such as the United Kingdom or Ghana. Arguments such as these are simply irrelevant, legally incorrect, and misleading to the jury. While the law permits the defendant to argue that the government has not carried its burden of proof to establish venue in this District, the law does not permit the defendant to confuse the jury and argue that the case would have been better brought elsewhere.

The rules governing admissible evidence are clear. Federal Rule of Evidence 402 requires that evidence be relevant to be admissible. Relevant evidence is defined as evidence having "any tendency to make the existence of any fact" that is of consequence to the determination of the action "more probable or less probable" than it would be without the evidence. See Fed. R.

21

Evid. 401.  Relevant evidence, however, is subject to the probative-prejudice balancing test of Federal Rule of Evidence 403.  See United States v. Watts, 934 F. Supp. 2d 451, 462-63 (E.D.N.Y. 2013).  Rule 403 permits the exclusion of evidence, even if relevant, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting of time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Second Circuit has stated that the "'district court is obviously in the best position to do the balancing mandated by Rule 403,' and, accordingly, this Court grants 'broad discretion' to the district court to admit or exclude evidence pursuant to Rule 403." United States v. Birney, 686 F.2d 102, 106 (2d Cir. 1982).

The defendant should not be permitted to argue that he should be acquitted because the case should have been brought in the United Kingdom, Ghana, or elsewhere.  Such argument is legally wrong.  This is a criminal case in U.S. federal court, and the only law that applies is U.S. federal criminal law.  The fact that this case involves bribes and kickbacks paid to Ghanaian nationals in Ghana does not provide a basis to argue that venue is inappropriate in this District. Rather, such arguments only serve one purpose: to needlessly confuse and mislead the jury into thinking that the United States is not the appropriate forum for the charged crimes, and that the case should be brought in other countries.

If the defendant is permitted to make such legally improper arguments, the risk of confusion to the jury would be especially high in this case.  At the close of the evidence, the government expects that the Court will provide the jury with a clear venue instruction based on the controlling law of this Circuit.  As discussed above, the government will clearly establish venue, including but not limited to the fact that the defendant was first brought to this District after he was extradited.  Nonetheless, the defendant is a Ghanaian citizen (in addition to being an

22

American citizen) and many of the acts in furtherance of the charged crimes occurred outside of this District and in other countries. Any argument from the defendant that the case should have been brought somewhere else will be inconsistent with those expected instructions and thereby risk "confusing the issues, misleading the jury, undue delay [and] wasting time." Fed. R. Evid. 403. As such, the probative value of such arguments or evidence from the defendant (which is none) is substantially outweighed by the dangers of prejudice, confusion and delay, and they should be precluded.

Arguments or evidence related to the claim that the case should have been brought elsewhere or that prosecution in this District is unfair would create an improper risk of jury nullification. It is well-settled that "it is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence." Sparf v. United States, 156 U.S. 51, 102 (1895); United States v. Carr, 424 F.3d 213, 220 (2d Cir. 2005). Courts have consistently held that while juries may have "the power to misapply the law," that power does not give rise to a right to do so. United States v. Thomas, 116 F.3d 606, 615-16 (2d Cir. 1997). "[N]o juror has a right to engage in nullification[] and, on the contrary, it is a violation of a juror's sworn duty to follow the law as instructed by the court." Thomas, 116 F.3d at 616. Indeed, "trial courts have the duty to forestall or prevent such conduct," and the Second Circuit has "categorically" rejected "the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent." Id. at 614, 616. Here, where the Court will instruct the jury as to the law of venue and ask the jury to apply the facts to the law, an argument by the defendant to the jury that his prosecution in this Court is unfair or should have happened elsewhere would be an argument for jury nullification.

23

For these reasons, similar arguments have been precluded in recent international corruption trials in this district.  "Statements to the effect of 'this case should be prosecuted elsewhere,' 'the jury should acquit/find [the defendant] not guilty because the case is better situated in a different venue or jurisdiction such as Mozambique,' and the like have minimal relevance and invite improper jury nullification." United States v. Chang, No. 18-CR-681 (NGG), 2024 WL 3303717, at *12 (E.D.N.Y. July 3, 2024).  Similarly, in Aguilar, Judge Vitaliano precluded the defendant "from making the broader argument that *none* of the counts *should have* been charged in the Eastern District of New York." United States v. Aguilar, No. 20-CR_390 (ENV), ECF Dkt. No. 362 at 2 (emphasis added); cf. United States v. Napout, No. 15-CR-252 (PKC), 2017 WL 6375729, at *13 (E.D.N.Y. Dec. 12, 2017) (precluding arguments that foreign law permitted commercial bribery because of an "obvious risk of jury nullification").

The Court should follow Chang and Aguilar in this case.  While the defendant should be permitted to contest whether the government has met its burden of proving venue in this District by a preponderance of evidence, he should not be permitted to elicit evidence or present arguments to the jury that he should have been prosecuted in another country, or that it is unfair for him to be prosecuted in this Court for reasons unrelated to the technical venue requirements.

IV.  The Court Should Permit the Government to Introduce the Defendant's Other Acts Evidence as Direct Evidence of the Charged Crimes or, In the Alternative, Pursuant to Rule 404(b)

The government seeks to introduce the following evidence either as direct evidence of the charged crimes or pursuant to Federal Rule of Evidence 404(b): (i) evidence that the defendant failed to report foreign bank accounts, specifically Ghanaian bank accounts that he used to funnel bribe payments to foreign officials in connection with the Power Plant deal; (ii) evidence that the defendant violated certain Bank policies; and (iii) evidence that the defendant used

24

personal email for improper reasons in connection with the charged bribery scheme but also on other occasions.

A.      Applicable Law

The Second Circuit has stated that evidence is "not other act evidence within the meaning of Rule 404(b)" if it is "admissible to prove material facts other than [the defendant's] propensity to commit a crime."    United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992). Indeed, relevant evidence is "not confined to that which directly establishes an element of the crime." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997).  "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency."  Id.; see also United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.").

In United States v. Towne, the Second Circuit specifically identified three categories of uncharged criminal activity that constitute direct evidence of the charged offense:

> Evidence of uncharged criminal activity is not considered "other crimes" evidence under Fed. R. Evid. 404(b) if it "arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial."

870 F.2d 880, 886 (2d Cir. 1989) (quoting United States v. Weeks, 716 F.2d 830, 832 (11th Cir. 1983)); see also United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); Gonzalez, 110 F.3d at 942.

Alternatively, under Rule 404(b), evidence of a defendant's "other crimes, wrongs, or acts" is admissible when offered for a purpose other than to prove the defendant's criminal

25

propensity.  See, e.g., United States v. Germosen, 139 F. 3d 120, 127 (2d Cir. 1998); United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984).  Rule 404(b) itself contains a non-exhaustive list of proper purposes for which "other act or crime" evidence may be admitted, including "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Fed. R. Evid. 404(b); see also Levy, 731 F.2d at 1002.  Although the government "must explain in detail the purposes for which the evidence is sought to be admitted," the Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application.  Levy, 731 F.2d at 1002 ("We have adopted the inclusionary or positive approach to [Rule 404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").

A party must satisfy three requirements for evidence of "other crimes, wrongs or acts" to be admitted under Rule 404.  First, the evidence must be offered for a purpose other than to prove the defendant's bad character or criminal propensity.  See United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991) (citing United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989)).  Second, the evidence must be relevant under Rules 401 and 402 and more probative than prejudicial in accordance with Rule 403.  See Mickens, 926 F.2d at 1328 (citing United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988)); Levy, 731 F.2d at 1002.  Third, if the defendant requests a jury instruction as to the limited purpose for which the government's evidence is admitted, the court must furnish such an instruction.  See Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002.

B.     The Court Should Permit the Government to Introduce Evidence That the Defendant Failed to Report Foreign Bank Accounts as Direct Evidence of the Charged Crimes or, In the Alternative, Pursuant to Rule 404(b)

The Bank Secrecy Act, by regulation of the Secretary of the Treasury, requires all U.S. persons, including U.S. citizens and resident aliens, to report to the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") any financial interest in or signatory or other authority over any and all bank or other financial accounts held in foreign

26

countries if the aggregate value of all such accounts exceeded $10,000 at any point during the calendar year, using FinCEN Form 114 (formerly TD F 90.22-1), Report of Foreign Bank and Financial Accounts (an "FBAR"). See 31 U.S.C. §§ 5314, 1010.350.

On or about June 26, 2015, the defendant filed an FBAR for calendar year 2014 (GX-7027 and the "CY 2014 FBAR") with FinCEN. The CY 2014 FBAR listed two foreign bank accounts, both located in Great Britain. The defendant failed to file an FBAR for the calendar years 2015, 2016 and 2017, despite the fact that he owned several foreign bank accounts, including the ones listed below, that each had an aggregate value of more than $10,000 during each of those calendar years: (i) Fidelity Bank Ghana Ltd. account ending in 6350; (ii) Zenith Bank Ghana Ltd. account ending in 2421 (identified as Berko Ghana Account 1 in the indictment); (iii) Zenith Bank Ghana Ltd. account ending in 3134 (identified as Berko Ghana Account 2 in the indictment); and (iv) Zenith Bank Ghana Ltd. account ending in 3486 (the "Berko Foreign Bank Accounts"). The government intends to prove that Berko used these accounts in furtherance of the charged bribery and money laundering schemes.

Evidence of the defendant's prior disclosure of foreign accounts and his failure to disclose foreign bank accounts during the conspiracy period is admissible as direct evidence of the crimes charged.[11] At trial, the government will introduce evidence that the defendant had an

---

[11]   The defendant's extradition on the FBAR counts (*i.e.*, Counts Four through Six of the indictment) was barred by the United Kingdom. Accordingly, pursuant to the Rule of Specialty, Berko cannot be tried on these counts. See United States v. Flores, 538 F.2d 939, 943–44 (2d Cir. 1976). But the doctrine of specialty "does not purport to regulate the scope of proof admissible into evidence in the judicial forum of the requisitioning state." Id. "[I]t has never been construed to permit foreign intrusion into the evidentiary or procedural rules of the requisitioning state, as distinguished from limiting the jurisdiction of domestic courts to try or punish the fugitive for any crimes committed before the extradition, except the crimes for which he was extradited." Id. (internal quotation marks omitted). "Prior-act evidence may be admissible as proof of the charged conduct, even though the defendant could not be charged with those crimes." United

obligation to disclose the Berko Foreign Bank Accounts in calendar years 2015 through 2017 and yet failed to disclose these accounts.  The fact that the defendant hid from U.S. authorities that he had foreign bank accounts in Ghana, which he used to funnel bribe payments to government officials, is direct evidence because it tends to show that the defendant knew that at least some of the transactions in those accounts were not legitimate and consciousness of guilt.  Cf. United States v. Hatfield, 685 F. Supp. 2d 320, 324 (E.D.N.Y. 2010) (finding that evidence that the defendants failed to include certain payments and property on their tax returns was inextricably intertwined with non-tax charges because it showed "consciousness of guilt").

Evidence of Berko's prior disclosure of foreign accounts and his failure to disclose his Ghanaian bank accounts during the conspiracy is also admissible pursuant to Rule 404(b) as evidence to establish the defendant's knowledge, intent, motive, plan, and lack of mistake in the charged crimes.  Courts in the Second Circuit "frequently admit tax evidence in cases involving other types of fraud to show the defendant's plan, lack of mistake, and knowledge that the funds were proceeds of illegitimate activity."  United States v. Kurland, No. 20-CR-30 (S-1) (NGG), 2022 WL 2669897, at *7 (E.D.N.Y. July 11, 2022), aff'd, No. 23-CR-6755, 2024 WL 5165547 (2d Cir. Dec. 19, 2024) (collecting cases);  United States v. Black, No. 13-CR-316 (DLI), 2014 WL 5783067, at *4-5 (E.D.N.Y. Nov. 5, 2014) (noting that other circuits' finding that "failure to report significant sums of money in tax filings is relevant to, and evidence of . . . participation in a money laundering conspiracy" was persuasive but nonetheless "conduct[ing] an analysis under 404(b), as an alternative basis" because the Second Circuit had not yet spoken to the issue).  The same reasoning applies in this case.  Evidence of the defendant's failure to report his foreign bank

---

States v. Fusco, No. 09-CR-1239 (PKC), 2011 WL 5116843, at *3 (S.D.N.Y. Oct. 27, 2011) (citing Flores), aff'd, 560 F. App'x 43 (2d Cir. 2014).

28

accounts tends to show consciousness of guilt.  Specifically, the fact that Berko disclosed two bank accounts located in Great Britain on his CY 2014 FBAR, which, as far as the government understands, were not used in furtherance of the charged criminal conduct, but failed to file FBAR forms disclosing his Ghanaian accounts, which the government seeks to prove were used to facilitate bribe payments, is highly probative of the defendant's knowledge that the financial transfers were in aid of illegitimate activity.

With regard to the requisite analysis under Rule 403, the probative value of the defendant's failure to file the required FBAR forms is not substantially outweighed by any undue prejudice.  The prior events do not involve more inflammatory facts or circumstances than the charged conspiracies.  See also United States v. Rosemond, 958 F.3d 111, 125 (2d Cir. 2020) ("The probative value of prior bad-act evidence is not substantially outweighed by the risk of prejudice if the conduct is not 'any more sensational or disturbing' than the charged crime.").

Accordingly, the Court should admit evidence of the defendant's prior disclosure and his failure to disclose his Ghanaian bank accounts either as direct evidence of the charged crimes or, in the alternative, pursuant to Rule 404(b).

C.    The Court Should Permit the Government to Introduce Evidence of the Defendant's Violation of Certain Bank Policies

The government intends to introduce evidence at trial that the defendant was trained on certain of his employer's internal policies and that his conduct in connection with the Power Plant deal violated these policies. This evidence is admissible pursuant to Rule 404(b) to show the defendant's knowledge, intent, motive, absence of mistake, or lack of accident, as well as to enable the jury to understand the complete story of the charged crimes.

During the relevant period, the defendant's employer maintained certain formal written policies including policies on engaging intermediaries/finders (GX-5583, 5173), anti-

29

bribery (GX-5015, 5048, 5586), and use of email and other messaging platforms (GX-5609). The company provided training to employees on these policies. See GX-5391. In 2014 and 2015— i.e., the same time frame when he was working on the Power Plant deal—the defendant completed numerous compliance trainings, including trainings on the above-listed policies. See, e.g., GX-5471, 5391, GX-5493, 5509. Notably, he completed the Bank's Anti-Bribery training, see GX-5392, 5391, and financial crimes compliance training, see GX-5375.

Notwithstanding these trainings, the defendant failed to follow his employer's policies, both by participating in the charged bribery scheme, and through his effort to conceal his actions and the actions of his co-conspirators from his employer.

Specifically, the Bank's Policy on Engaging Intermediaries/Finders, which governed interaction with third parties that introduced the firm to government officials or that were compensated for obtaining government licenses, permits or services, required notification to and approval from the Bank's compliance function ("Compliance") and the Firmwide Capital Committee if an intermediary was used in a contemplated transaction, particularly if a politically exposed person ("PEP")[12] would be compensated as part of the arrangement. See GX-5583 at 1. The policy required notification even if it was a client of the Bank—in this case, the Turkish Energy Company—that engaged the intermediary. Id. Though Ghanaian intermediaries—including Co-Conspirator 1, Co-Conspirator 4, and Ghana Consulting Company 1—were used to facilitate interaction with Ghanaian government officials, the defendant did not notify either Compliance or the Firmwide Capital Committee of their involvement. Concealment in the face of required notification is evidence that the defendant acted willfully and with a corrupt intent.

---

[12]     Under the policy, Presidential Relative, the brother of the President of Ghana, would have been categorized as a PEP.

30

The Bank's anti-bribery policy stated, in relevant part:

Almost every country has anti-bribery laws or is a party to international anti-bribery conventions. Collectively, these laws and conventions prohibit the firm, its personnel, and others acting on the firm's behalf from offering, making or receiving payments or providing or receiving goods or services for the purpose of gaining an improper competitive advantage or inducing or rewarding the improper performance of a relevant function or activity.

GX-5015 at 1. The policy specifically cited the FCPA and the UK Bribery Act as examples, putting the defendant on notice that his conduct was illegal. The policy further stated:

- [The Bank] prohibits its personnel from providing anything of value to obtain or retain business or favored treatment from: public officials; candidates for office; employees of state-owned enterprises; employees or officers of counterparties, clients/customers, or suppliers; any agent of the aforementioned parties; or any other person with whom the firm does or anticipates doing business.

- The prohibition against providing "anything of value" to obtain or retain business or favored treatment includes obvious improper payments, such as cash bribes or kickbacks, but also may include other direct or indirect benefits and advantages, such as inappropriate gifts, meals, entertainment, charitable contributions, and offers of employment or internships.

    ….

- [The Bank] prohibits its personnel and others acting on its behalf from making payments to government officials, other than published fees and other fees paid directly to government agencies, even when the purpose of the payment is merely to expedite or secure performance of a routine governmental action such as obtaining official documents, processing governmental papers, or providing postal or utility services. Although the FCPA permits such "facilitating payments" in limited circumstances, the UK Bribery Act and other statutes to which the firm is subject do not permit them.

- Any [personnel of the Bank] person asked for a facilitation payment in connection with firm business must report the request promptly to one of

31

the firm's <u>designated anti-bribery personnel</u> or a compliance officer serving your business.

GX-5015 at 1–2 (internal footnotes omitted).  The defendant participated in a scheme to bribe foreign officials in order to obtain a power plant deal for the Turkish Energy Company, notwithstanding the fact that he was trained on these policies and therefore aware of the FCPA and UK Bribery Act prohibitions.  Thus, the policies and trainings are relevant to establish the defendant's knowledge, his willful intent, absence of mistake, and lack of accident.

The Court should also permit the government to introduce evidence that the defendant violated the Bank's 2013 policy on proper email use.  This policy, which was effective when the defendant was working on the Power Plant deal, stated that it was "firm policy that only firm approved communications systems be used for client communications."  GX-5609.  It went on to state: "Do not use personal e-mail, instant messaging, or other electronic messaging accounts for client communications or other firm business."  <u>Id.</u> at 1.  The policy specifically prohibited use of Gmail, and other internet-based email systems for business.  <u>Id.</u>  Compliance trainings reiterated that no email involving business-related information or materials should go to personal email accounts. GX-5493 at 19.  Despite this, the defendant used his personal email account to communicate with co-conspirators and Ghanaian government officials on their personal email accounts regarding the Power Plant Deal, an issue that was flagged by the Bank in 2016.  GX-5342.  As one example, in the midst of a discussion of bribe payments to a Ghana official, the defendant instructed his co-conspirators that they should use "Gmail only!"  GX-6346.  Efforts to conceal his communications with co-conspirators, some of whom worked for the Turkish Energy Company (a client of the Bank), and to keep the Bank in the dark about Co-Conspirator 1 and his other co-conspirators' true role in the Power Plant deal, in violation of the Bank's policy, is relevant to the defendant's corrupt intent and part of the complete story of the criminal scheme.

32

Moreover, the probative value of the defendant's violation of the Bank's policies is not substantially outweighed by any undue prejudice. Violation of internal policies does not involve more inflammatory facts or circumstances than the charged conspiracies, and the evidence is substantially probative of the defendant's state of mind. See Rosemond, 958 F.3d at 125.

D.    The Court Should Permit the Government to Introduce Evidence that the Defendant Used Personal Email for Improper Purposes

The government will also seek to admit pursuant to Rule 404(b) other emails sent by the defendant from one of his personal email accounts during the same period as the charged offenses to demonstrate the defendant's improper reasons for using personal email. As the government explains above, the defendant's use of personal email violated the Bank's policies, which prohibited use of personal email. The government will argue that the defendant's use of personal email was an attempt to hide the bribery scheme from compliance personnel and others at the Bank and is therefore evidence of the defendant's consciousness of guilt and mens rea.

In or about April and May 2016, the defendant discussed a potential financing opportunity with the government of the Republic of Zambia. The proposal, which was forwarded to the defendant, discussed payments of approximately $1.05 million that would be paid to "supporters of the process" inside the Zambian government for "Motivation." See GX-6430 (Exhibit B) at 2–3. The defendant replied, in part "[t]hey are asking for bribes and you sent to my work email! Lol" He then replied "I will look at it and revert," GX-6430 (Exhibit B) at 1, and followed up to explain: "Let's keep our conversations to private mail till I Know there is a trade to do. Work emails are heavily monitored." GX-6431 (Exhibit C) at 1 (emphasis added). The government submits that these emails, are relevant to establish the defendant's purpose for using his personal email—that his "work emails are heavily monitored"—when discussing bribe

33

payments and his awareness that his conduct was wrongful. As such these emails are relevant to establish the defendant's intent (and lack of mistake) under Rule 404(b)(2).

V.      The Court Should Preclude the Defendant From Re-Litigating the Motion
        to Suppress and to Dismiss

The defendant should be precluded from arguing or suggesting to the jury that emails obtained pursuant to judicially-authorized search warrants were obtained improperly or that the affidavits filed in support of the search warrant applications contain misstatements. The Court has already denied the defendant's motion to suppress, and the parties agree that the Court should instruct the jury that this evidence was lawfully obtained. See ECF Dkt. No. 65 at 111–12. Any evidence or argument about whether the search warrant was valid is wholly irrelevant and, as such, should be precluded. See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

Federal Rule of Evidence 104 makes clear that the Court decides "preliminary questions" outside the presence of the jury, including whether evidence is admissible. Fed. R. Evid. 104. Whether the government legally searched and seized the contents of the defendant's personal email account, and whether the supporting affidavit was accurate, are preliminary questions to be decided by the Court prior to trial. Likewise, whether the government impermissibly delayed in charging and arresting the defendant is a preliminary question for the Court and not the jury. The Court decided these issues in the government's favor following extensive briefing, and in the case of the motion to dismiss, following an evidentiary hearing.

Notwithstanding, in a May 12, 2026 letter to the government (attached hereto as Exhibit D), the defendant previewed that he may challenge law enforcement's reliance on information from a confidential source (the "Confidential Source"), including information that Special Agent Justin McNair included in his April 2017 affidavit in support of the warrant to search the defendant's personal email account (the "McNair Affidavit"). See Ex. D at 2–3. The Court

34

has already found that "the magistrate judge had a substantial basis for concluding that probable cause existed" based on the information in the McNair Affidavit and "even absent the information from the source, the affidavit was sufficient to establish probable cause." See Transcript of Dec. 17, 2015 Status Conference, attached hereto as Exhibit E, at 24–25.  The Court further described that "even had the omitted information about [the source's financial motive] been included in the affidavit, such inclusion would not have undermined the probable cause showing." Id.  Moreover, Agent McNair will not be a witness at trial.  His credibility—and prior statements in the McNair Affidavit—are not relevant to any factual issue to be decided by the jury.[13]

To permit the defense to introduce evidence suggesting, or to argue to the jury, that the search of the defendant's personal email account was unlawful or otherwise improper would flout Rule 104 and would invite a needless and irrelevant mini-trial on the scope of the Fourth and Fifth Amendments and whether law enforcement properly obtained the evidence in this case. See United States v. Lights, 2016 WL 7098633, at *1–2 (S.D.N.Y. Dec. 5, 2016) ("The stop and subsequent searches were all based on valid probable cause.  This issue has been litigated and decided.  No reference to the illegality of the stop or subsequent searches will be permitted at trial.").  Moreover, any arguable probative value would be substantially outweighed by the risks enumerated in Rule 403, including unfair prejudice, confusion of the issues, and misleading the jury, as well as undue delay and waste of time.

Ultimately, permitting the defense to relitigate the suppression issues already decided by this Court would distract the jury from the questions actually presented and invite the

---

[13]    As we explain below, the defendant should be precluded from attacking the credibility of the Confidential Source to impeach Agent McNair—who is not a witness—and the government's investigation.  The Confidential Source's statements and credibility are irrelevant to the evidence to be presented and the factual issues to be decided by the jury.

jurors to decide the case based on their feelings about law enforcement investigations rather than the facts case.  The Court should therefore preclude such argument or questioning.

VI.    The Court Should Preclude the Defendant From Impeaching the Confidential Source or Cross-Examining Law Enforcement Witnesses about their Purported Failure to Consider the Confidential Source's Reliability

The Court should preclude the defendant from seeking to impeach the credibility of the Confidential Source or raise irrelevant matters related to his reliability.  The government does not intend to call the Confidential Source as a witness at trial and will not seek to admit any of the Confidential Source's statements for their truth.  Because the Confidential Source is not a "declarant" within the meaning of Federal Rule of Evidence 806, his credibility is irrelevant and cannot be impeached.  By the same token, evidence of the Confidential Source's statements to law enforcement—which are inadmissible hearsay—his motives for assisting the government, or any potential bias are irrelevant and would mislead the jury, confuse the issues, and waste time.[14]

As the Court is aware, the Confidential Source provided the FBI with recordings of some of the conspirators that he made in Ghana and also assisted the FBI in recording several of his conversations with the defendant.  At trial the government anticipates introducing excerpts of

---

[14]    The government has provided the defendant with Jencks Act material for the Confidential Source on an "Attorney's Eyes Only" basis, even though the government was under no obligation to do so.  See United States v. Menendez, No. 23-CR-490 (SHS), 2024 WL 2867107, at *1 (S.D.N.Y. June 4, 2024) ("Since the CHS will not be a government witness and [Redacted] out-of-court statements will not be offered for their truth, the CHS's credibility is not at issue. There is therefore no obligation for the Government to provide Menendez with impeachment information pursuant to Giglio v. United States, 405 U.S. 150 (1972)."); United States v. Whitehead, No. 22 Cr. 692 (LGS), ECF Dkt. No. 58, at 5 (S.D.N.Y. Feb. 22, 2023) ("Defendant's January 20, 2023, motion for pretrial production of evidence admissible to attack the credibility of Brandon Belmonte is DENIED as moot based on the Government's representation that it does not intend to call Belmonte as a witness or offer any of his statements for the truth of the matter asserted." (citing cases)); Perez, 2005 WL 2709160, at *4 ("[W]hen a declarant's credibility has not been put into issue, it cannot be attacked with impeachment material, and the Giglio disclosure obligation therefore is not met.").

a recorded meeting between the Confidential Source and the defendant.  That meeting was recorded with the assistance of the FBI.  Accordingly, the government anticipates introducing this evidence through an FBI agent who assisted in recording the meeting.  The Confidential Source is otherwise irrelevant to the government's evidence.  He did not provide any of the other evidence to be introduced at trial, and as far as the government is aware, he did not participate in the charged scheme.

      A.      <u>The Defendant Should be Precluded from Impeaching the Confidential Source Because He Is Not a "Declarant" Under Rule 806</u>

The Court should preclude the defendant from attacking the Confidential Source's credibility pursuant to Rule 806 because he is not a "declarant."

Rule 806 provides that when a "hearsay statement – or a statement described in Rule 801(d)(2)(C), (D), or (E) – has been admitted in evidence, the declarant's credibility may be attacked, and then supported" as if "the declarant had testified as a witness."  Fed. R. Evid. 806.  This rule reflects the fact that "[t]he declarant of a hearsay statement which is admitted in evidence is in effect a witness. His credibility should in fairness be subject to impeachment . . . as though he had in fact testified."  Fed. R. Evid. 806 Advisory Committee Note; <u>see also</u> <u>United States. v. Jackson</u>, 345 F.3d 59, 71 (2d Cir. 2003) ("It is thus clear that <u>Brady</u> and its progeny may require disclosure of exculpatory and/or impeachment materials whether those materials concern a testifying witness or a hearsay declarant.").  The opposite is equally true. Where a non-testifying individual is not "in effect a witness" because his or her out-of-court statements are <u>not</u> offered for the truth of a matter asserted, his or her credibility is not at issue.  <u>See</u> Fed. R. Evid. 806 (permitting impeachment evidence for non-testifying witnesses only "[w]hen a hearsay statement . . . <u>has been admitted in evidence</u>" (emphasis added)); <u>United States v. Paulino</u>, 445 F.3d 211, 217 (2d Cir.

37

2006) ("a statement not offered to prove the truth of the matter asserted may not be impeached under Rule 806").

The Confidential Source is not a declarant within the meaning of Rule 806. The Confidential Source's recorded statements will not be admitted for their truth. Rather, these statements will be admitted as context for the defendant's own statements and for their effect on the listener, the defendant. For these reasons, the Southern and Eastern Districts have repeatedly precluded impeachment of informants who recorded the defendant, and the Second Circuit has repeatedly affirmed. See United States v. Wagner, 103 F. App'x 422, 429 (2d Cir. 2004) (where a government cooperator "did not testify at trial" and where his recorded statements were entered into evidence not for their truth, but for the context of other statements, the "[cooperator's] credibility was irrelevant"), cert. granted and judgment vacated on other grounds, 544 U.S. 958 (2005); United States v. Perez, No. 05-CR-441 (PKL), 2005 WL 2709160, at *3 (S.D.N.Y. Oct. 20, 2005) ("Because the informant's statements are not hearsay, and because the government will not call the informant as a witness at trial, it follows that defendant may not impeach the credibility of the informant."); United States v. Romano, No. 12-CR-691 (JFK), 2014 WL 69794, at *1 (E.D.N.Y Jan. 8, 2014) ("[I]t is well settled in this Circuit that a district court may preclude the defense from impeaching an informant or cooperator who does not testify and whose recorded statements are not offered for their truth."); United States v. McNair, 46 F. App'x 658, 659–60 (2d Cir. 2002) ("Slinger's statements "were not offered to prove the truth of the matters asserted but only to render what [Diana McNair] said in these conversations intelligible," and therefore were not hearsay. Since Slinger did not testify and his statements were not hearsay, the district court properly barred the attack on his credibility.") (internal citations omitted); see generally United States v. Shyne, 617 F.3d 103, 107 (2d Cir. 2010) ("The defendants' argument that because a non-

38

testifying declarant's statement comes into evidence against them somehow converts that declarant into the equivalent of a witness who has appeared and testified under oath is the proverbial comparison of apples to oranges."). In short, the rule is simple: "Unless the witness about whom impeachment material is sought actually testifies (or his statements are admitted under circumstances making him subject to impeachment pursuant to Rule 806), the evidence is not admissible." United States v. Percoco, No. 16-CR-776 (VEC), 2018 WL 9539131, at *1 (S.D.N.Y. June 14, 2018).

Accordingly, the Court should preclude the defendant from impeaching the Confidential Source based on his statements in recordings to be introduced at trial.

B.     The Defendant Should Otherwise Be Precluded From Introducing Evidence or Argument Related to the Confidential Source's Reliability

The Court should preclude the defendant from otherwise injecting into trial irrelevant evidence of the Confidential Source's motivations, bias, or other statements to law enforcement, which are inadmissible hearsay. Despite the Confidential Source's limited role in the investigation and his non-existent role in the scheme, the defendant has made clear that he intends to make the Confidential Source a centerpiece of his defense. The government understands from defense counsel that the defendant "intends to attack the thoroughness of the Government's investigation, including its reliance on the [Confidential Source] who was, at a minimum, 'insufficiently informed or candid,' and potentially 'anxious' for the defendant's arrest." Ex. D at 2 (quoting Kyles v. Whitley, 514 U.S. 419, 454–55 (1995)). This line of defense is irrelevant to the evidence to be introduced at trial and would confuse the issues and mislead the jury. It should be precluded under Rule 402 and Rule 403.

The Confidential Source's role in the investigation, motives, and other statements to law enforcement are irrelevant to whether he may be impeached. Rule 806 permits

39

impeachment of "declarants" who are akin to testifying witnesses.  No rule permits impeachment of non-witnesses.  The Second Circuit has rejected arguments that a defendant should be permitted to impeach a non-witness based on their role in the investigation or involvement in charged conduct.  See United States v. McGowan, 58 F.3d 8, 15–16 (2d Cir. 1995) ("[Government informant] was not a witness at trial, and his out-of-court statements were not admitted for their truth. We do not agree with the argument that '[d]efense counsel should have been permitted free rein in challenging the credibility of [the informant] because [government informant] was a central figure in this trial.' Because [the informant's] credibility was irrelevant, the district court was well within its discretion in denying impeachment.").  For instance, in United States v. Regan, the Second Circuit held that the district court properly prohibited the defendant from impeaching two informants whose information prompted the government's investigation.  103 F.3d 1072, 1082 – 83 (2d Cir. 1997).  Relying on McGowan, the Second Circuit explained that "evidence attacking the credibility of [the informants] would have little if any probative value, and if permitted, [would] surely unfairly prejudice or mislead the jury and confuse the issues." Id. at 1083; accord United States v. Silva, 71 F.3d 667, 670–71 (7th Cir. 1995) (affirming district court order precluding impeachment of non-testifying informant because "[n]otwithstanding [the defendant's] assertion to this court at oral argument that 'a confidential informant with a sordid history like [the informant] is always beneficial to the defense in front of a jury,' the unsavory nature of an informant is not admissible into evidence merely to make the prosecution appear dissolute by association.  [The informant]'s credibility was not at issue in this trial, and thus evidence to impeach him would have been irrelevant and consequently inadmissible.").

The defendant cannot circumvent these limits by arguing that the same evidence is relevant to impeach a law enforcement witness or the investigation more generally as he suggests

40

in his letter to the government.  See Ex. D at 2 (citing Kyles, 514 U.S. at 454–55).  In Kyles, the Supreme Court held that the state violated Brady by failing to provide the defense impeachment information—including prior statements by two key eye-witnesses and an informant.[15]  Kyles did not decide whether the impeachment information about the informant would be admissible.  Nor does Kyles create a freestanding exception to the Rules of Evidence that permits defendants to introduce an informant's bias or hearsay statements simply because he or she provided information to law enforcement.  In Kyles, the informant's motives, bias, and prior statements were inextricably intertwined with the jury's evaluation of the state's evidence and witnesses.  The defense in Kyles claimed that the informant was an alternative perpetrator who planted evidence to frame the defendant.  Kyles, 514 U.S. at 429 ("The theory of the defense was that Kyles had been framed by [the informant] who had planted evidence in Kyles's apartment and his rubbish for the purposes of shifting suspicion away from himself.").  In fact, there was significant evidence that the informant might have planted evidence (that was ultimately admitted at trial) and then directed law enforcement to recover that evidence, and that he was a plausible alternative perpetrator.  See id. at 447–49.[16]  And a detective testified in Kyles that the informant was "never a suspect"—despite this evidence pointing towards his guilt.  Id. at 447–48.

There is no similar nexus between the evidence in this case and the Confidential Source.  The defendant has not suggested that the Confidential Source was involved in the charged scheme.  The government is not aware of evidence he attended any of the key meetings among the

---

[15]    As we note above, the government has produced Jencks Act material for the Confidential Source even though the government does not intend to call him as a witness and he is not a "Declarant" within the meaning of Rule 806.

[16]    The suppressed evidence in Kyles included information that the informant was seen at the defendant's apartment in the very place where the police ultimately found the murder weapon.  Id. at 449.

conspirators.  Nor is the Confidential Source copied on any of the conspirators' emails about the scheme, which have been marked by the government as exhibits.  Moreover, unlike in <u>Kyles</u>, the Confidential Source could not have fabricated or altered the government's evidence.  As the Court is aware, the government obtained critical evidence—to be introduced at trial—through search warrants served on internet service providers for the conspirators' personal email accounts.  The Confidential Source could not have fabricated or altered this evidence, and the Court has already denied the defendant's motion to suppress this information.  The government's other evidence—such as emails obtained from the Bank and the Turkish Energy Company—has even less of a connection to the Confidential Source.

At bottom, the Confidential Source had a limited role in the government's investigation that is irrelevant to the jury's evaluation of the evidence or the sufficiency of the investigation.  Cross-examination about the Confidential Source's motives or his statements to law enforcement is simply a sideshow.  It would waste jury time, confuse the issues, and potentially require a minitrial on the veracity of his statements—which will not be admitted—or his motives.  The Court should preclude such evidence under Rule 402 and Rule 403.

VII.    <u>The Court Should Preclude Evidence or Argument Regarding the Government's Charging Decisions and Policies</u>

The Court should preclude the defendant from offering evidence or argument related to the government's charging decisions in this case or in related cases, including as it relates to the government's review of this case pursuant to the President's February 10, 2025 Executive

Order (the "Executive Order") or the Deputy Attorney General's June 9, 2025 memorandum regarding Guidelines for Investigations and Enforcement of the FCPA (the "DAG Memo").[17]

The government's investigation uncovered evidence related to various individuals, including the uncharged co-conspirators who are pseudonymously identified in the indictment, and entities, including the defendant's then-employer, identified in the indictment as "U.S. Financial Institution" and in these motions as the "Bank." In an effort to paint the defendant as a scapegoat or victim of unfair government overreach, the defendant may seek to make improper arguments concerning the government's decision to charge him, while deciding not to charge, at least to date, certain co-conspirators or the defendant's employer. He may also seek improperly to argue that this case is inconsistent with the Executive Order and DAG Memo, or present inadmissible evidence of other cases which he claims were dismissed pursuant to the Executive Order and DAG Memo.

The Court should preclude these arguments, which improperly invite the jury to speculate about the government's prosecutorial discretion and internal deliberations, and preclude any such evidence. The government's decision-making is irrelevant. It has no bearing on any disputed issue of fact. Moreover, such evidence would waste the jury's time and necessitate a minitrial on the merits of the government's decision-making and the reasons for the government's decisions with respect to other individuals and entities and in other, unrelated cases. The Court should preclude these arguments under Rule 402 and Rule 403.

---

[17] Neither the Executive Order nor the DAG Memo create "any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States . . . ." See DAG Memo at 1 n.1; see also Executive Order § 4(c).

The Supreme Court has recognized that "[i]n our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." Wayte v. United States, 470 U.S. 598, 607 (1985) (quoting United States v. Goodwin, 457 U.S. 368, 380 n.11 (1982)); see also United States v. Armstrong, 517 U.S. 456, 464 (1996) ("The Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws."). Charging decisions, which are "rarely simple," implicate complex considerations including the strength and importance of a case, the prosecution's general deterrence value, the government's enforcement priorities, and the allocation of resources. See Town of Newton v. Rumery, 480 U.S. 386, 396 (1987). Although the Second Circuit has rejected a "categorical rule" regarding the admissibility of charging decisions, instead requiring an inquiry into the relevance and probative value of a piece of evidence, United States v. White, 692 F.3d 235, 245-46 (2d. Cir. 2012), courts have held that such evidence did not meet the relevance and probative value standards when the evidence was not "central to the defendant's claim of innocence." See United States v. Ramsey, No. 21-CR-495 (ARR), 2023 WL 2523193, at *6 (E.D.N.Y. Mar. 15, 2023); see also United States v. Hill, No. 12-CR-214 (KAM), 2014 WL 198813, at *1–2 (E.D.N.Y. Jan. 14, 2014), aff'd, 658 F. App'x 600 (2d Cir. 2016), and aff'd, 658 F. App'x 600 (2d Cir. 2016) (excluding evidence under Fed. R. Evid. 403 of King's County prosecutor's decision not to charge defendant). A defendant is entitled to cross-examine government witnesses as to inconsistent statements and their motivations or potential bias for testifying, but not to invade the government's charging decisions when such decisions "are not relevant to the issue of the defendant's guilt or innocence." United States v. Re, 401 F.3d 828, 833 (7th Cir. 2005).

Here the government's decision not to charge certain individuals has no bearing on the facts of this case. While the defendant may argue that other individuals did not act wrongfully,

44

he may not argue that the government's charging decisions reflect any conclusions about their culpability.  They do not, and the fact of the government's charging decision does not make any "fact of consequence more or less probable," as Rule 401 requires.  Similarly, the government's decision not to prosecute the defendant's employer has no bearing on the facts.  See United States v. Aguilar, No. 20-CR-390 (ENV), ECF Dkt. No. 362, at 13 (E.D.N.Y. July 15, 2024) (granting the government's unopposed motion to preclude similar arguments).  The government's process under the Executive Order is even further afield.  See United States v. Hobson, No. 22-CR-86 (RJC), ECF Dkt. No. 157 (W.D. Pa. Jan. 28, 2026) (granting the government's motion to preclude arguments related to the Executive Order).

While these arguments have no relevance, they are highly prejudicial and likely to distract and confuse the jury and invite nullification.  See Fed. R. Evid. 403.  The jury may not substitute the government's charging decisions with respect to other individuals for its own weighing of the evidence against the defendant.  To respond to this argument, the government would be required to explain the factors the government considers in exercising prosecutorial discretion—including factors unrelated to the merits—and contrast the proof and circumstances as to each other individual with the proof against the defendant.  The Executive Order likewise outlines a series of considerations that have no bearing on the defendant's guilt or innocence but would require extensive explanation by the government.  And, similarly, evidence and argument related to the government's decisions with respect to the defendant's employer would require the government to explain the factors considered by the government in assessing corporate cases, See United States Department of Justice, Justice Manual, § 9-28.300, et seq. (identifying 11 relevant factors), the defendant's employer's cooperation with the investigation, and potentially other investigations and resolutions related to the defendant's employer from the same period.  None of

45

this evidence is relevant to the jury's evaluation of the defendant's guilt, and all of it would suggest the jury should consider improper factors in evaluating the case and necessitate a series of minitrials.

Accordingly, the Court should preclude the defendant from presenting argument or evidence regarding the government's charging decisions with respect to other individuals or entities, in this case and other cases, and the Executive Order.

VIII.   The Court Should Preclude Evidence or Argument That Paying Bribes Is Common Practice in Ghana or the Energy Sector Generally

The charges in this case concern the defendant's participation in a scheme to pay bribes to Ghanaian officials to obtain and retain business for himself, his employer the Bank, and the Turkish Energy Company.  The defendant may seek to argue at trial that he should be excused from his criminal conduct either because bribery was common in the energy sector or because bribery was simply the way that business was done in Ghana.  Such an "everybody-was-doing-it" defense would be both irrelevant and unduly prejudicial, and evidence and argument in support of such a defense should be precluded.

First, it is well established that evidence relating to industry practice "is entirely irrelevant and improper" because "[i]ndustry practice is not a defense" to a federal criminal charge. United States v. Mahaffy, No. 05-CR-613 (S-3) (ILG), 2007 WL 1213738, at *3 n.5 (E.D.N.Y. Apr. 24, 2007); see also United States v. Fowler, 932 F.2d 306, 315-16 (4th Cir. 1991) (affirming district court's exclusion of testimony supporting the "everybody-does-it defense" as irrelevant); United States v. Brookshire, 514 F.2d 786, 788-89 (10th Cir. 1975) ("[C]ustom and usage involving criminality do not defeat a prosecution for violation of a federal criminal statute."); Burnett v. United States, 222 F.2d 426, 427 (6th Cir. 1955) (per curiam) ("No custom is a justifiable defense for violation of the criminal code of the United States."); Smith v. United States,

46

188 F.2d 969, 970 (9th Cir. 1951) ("Custom, involving criminality, cannot justify a criminal act.");

United States v. Berg, 710 F. Supp. 438, 445 (E.D.N.Y. 1989) (limiting testimony concerning the

"custom of other arms dealers in complying with arms export laws" because such evidence was

"irrelevant" to the state of mind of the defendants); United States v. Schwartz, 924 F.2d 410 (2d

Cir. 1991); United States v. Slapo, 285 F. Supp. 513, 513-14 (S.D.N.Y. 1968) ("[W]e have not yet

reached the point, at least in this court's view, where an industry custom and practice serves to

repeal criminal laws.").[18]

Thus, in United States v. Inniss, No. 18-CR-134 (KAM), 2019 WL 6999912,

(E.D.N.Y. Dec. 20, 2019), Judge Matsumoto granted the government's motion in limine

precluding "any evidence that [defendant's employer] has paid bribes to other individuals, or

argument that bribery may have been commonplace or part of industry practice in Barbados." Id.

at *7.  The evidence was irrelevant, among other reasons, because "[w]hether or not bribery is an

industry practice in Barbados would not shed any light on the defendant's state of mind." Id.

Similarly, as the Fifth Circuit explained in an FCPA case, "multiple violations of a law do not

make those violations legal." United States v. Kay, 513 F.3d 432, 442 (5th Cir. 2007); see also

---

[18]    The text and legislative history of the FCPA also establish that widespread corruption in a foreign official's country is not a defense.  Notably, the FCPA provides a defense when "the payment, gift, offer, or promise of anything of value that was made, was lawful under the written laws and regulations of the foreign official's . . . country."  15 U.S.C. § 78dd-2 (c)(1) (emphasis added).  As the word "written" makes clear, compliance with industry or local custom, or "unwritten" laws, is no defense.  In fact, Congress inserted the word "written" before "laws" when it added this defense because "[t]he Conferees wish[ed] to make clear that the absence of written laws in a foreign official's country would not by itself be sufficient to satisfy this defense." H.R. Rep. No. 100-576, at 922 (1988) (Conf. Rep.).  In any event, Ghanaian law prohibits bribery. See Ghana Criminal Offences Act, 1960, Act 29, §§ 239 (Corruption of and by public officer or juror), 244 (Acceptance of bribe by public officer, after doing act), 245 (Promise of bribe to public officer, after act done), 252 (Accepting or giving bribe to influence public officer or juror), https://repository.parliament.gh/server/api/core/bitstreams/c47e21a5-365c-4bb1-aef0-a6b67179c0f0/content (last visited June 6, 2026).

United States v. Aguilar, No. 20-CR-390 (ENV), ECF Dkt. No. 362 at 2 (E.D.N.Y. July 15, 2024) (granting the government's unopposed motion to preclude evidence or argument that paying bribes was common practice in Ecuador and Mexico or the petroleum industry generally).  Accordingly, it is no defense that others "were guilty of similar bribery" and that the defendant may have viewed such bribery as necessary "to keep up with competitors."  Id.  In this case, as in others, "only the defendant's actions and state-of-mind [are] material to [his] guilt" and "the fact that others may have [engaged in] improper conduct does nothing to excuse" his conduct.  United States v. Oldbear, 568 F.3d 814, 821 (10th Cir. 2009); see Kay, 513 F.3d at 442 (affirming district court's preclusion of "'everybody-is-doing-it' defense").

Second, even if it were somehow relevant, argument or evidence that bribery was widespread or commonplace would invite the jury to nullify on the ground that it is unfair that Berko is being prosecuted while others are not, or that Berko was unfairly compelled to break the law to succeed at his job.  This obvious risk of jury nullification warrants the exclusion of such evidence.  See United States v. Pitt-Des Moines, Inc., 168 F.3d 976, 991 (7th Cir. 1999) (affirming exclusion evidence of industry custom and practice "based on a fear that the jury might find [the defendant] not guilty because 'everyone does it'"); see also United States v. Rivera, No. 13-CR-149, 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (district court may consider "the risk of jury nullification" in determining admissibility of evidence under Fed. R. Evid. 403) (citing United States v. Al Kassar, 660 F.3d 108, 124 (2d Cir. 2011)); United States v. Levin, No. 15-CR-101, 2016 WL 299031, at *10 (S.D.N.Y. Jan. 25, 2016) (same).  Further, apart from the risk of nullification, such evidence would also waste time and distract from the issues at the trial.  See United States v. Brooks, 681 F.3d 678, 709 (5th Cir. 2012) (affirming district court's exclusion of defendant's proffered industry practice evidence that "other energy companies were also

48

submitting similarly false data" because evidence that fraudulent practices may be common in a particular industry "pose[s] a threat of confusing the jury and detracting from relevant information about the conduct of the actual parties"); Oldbear, 568 F.3d at 821 (affirming exclusion of customary practice evidence under Rule 403 because it was likely to create a "sideshow from which the jury could have gleaned little valuable information").

Accordingly, the Court should preclude the defendant from suggesting through evidence or argument that bribery is commonplace in Ghana or in the energy sector more generally.

IX.    The Court Should Preclude Evidence or Argument That the Defendant
       Was Extorted Into Paying Bribes

The Court should preclude the defense from offering any evidence or argument suggesting that the defendant was pressured or extorted by Ghanaian officials into paying the bribes, or that paying bribes is necessary to conduct business with the Ghanaian government or its instrumentalities like the ECG, VRA and PURC.  There is a narrow exception to the FCPA where a defendant can establish that a demand for payment is made in conjunction with an imminent threat to health or safety.  Absent such a showing, evidence that the defendant was pressured or otherwise extorted into making payments is irrelevant and unduly prejudicial under Rules 401 and 403.

Though payments made "under duress" are not criminal under the FCPA, "'[t]hree discrete elements must be met to establish coercion or duress.'"  United States v. Kozeny, 582 F. Supp. 2d 535, 540 n.31 (S.D.N.Y. 2008) (quoting United States v. Gonzales, 407 F.3d 118, 122 (2d Cir. 2005)).  "'These are: (1) a threat of force directed at the time of the defendant's conduct; (2) a threat sufficient to induce a well-founded fear of impending death or serious bodily injury; and (3) a lack of a reasonable opportunity to escape harm other than by engaging in the illegal activity.'"  Id. (quoting Gonzales, 407 F.3d at 122).  Thus, as the FCPA's legislative history makes

clear, duress or extortion may be a defense only where there is a well-founded and unavoidable threat of violence, such as a payment "made to an official 'to keep an oil rig from being dynamited.'" Id. (quoting S. Rep. No. 95-114, at 10–11). There is, by contrast, no duress or extortion defense to payments that were "'demanded on the part of a government official as a price for gaining entry into a market or to obtain a contract.'" Id. (quoting S. Rep. No. 95-114, at 10–11); see also S. Rep. No. 95-114, at 11 (noting that the fact that the payment was "first proposed by the recipient . . . does not alter the corrupt purpose on the part of the person paying the bribe").

Absent a prima facie showing that the defendant can establish all three elements of a duress defense, the defendant may not introduce evidence related to coercion, generalized fear, or pressure to pay bribes. Such evidence is irrelevant, confusing and invites jury nullification. See United States v. Alicea, 837 F.2d 103, 107 (2d Cir. 1988) (holding that evidence of duress is properly excluded at trial where the evidence would be insufficient to warrant a jury charge on the defense). As the Second Circuit explained in United States v. Bifield:

> Once the trial court had determined that the tendered [duress] defense failed, evidence going to that defense was irrelevant since it was of no 'consequence to the determination of the action.' Fed. R. Evid. 401. Thus, the testimony regarding duress which appellant sought to present was properly excluded under Federal Rule of Evidence 402. As the Supreme Court said in Bailey, juries should not be burdened with testimony.

702 F.2d 342, 350 (2d Cir. 1983); see also United States v. Adelekan, 567 F. Supp. 3d 459, 470 (S.D.N.Y. 2021) (precluding defendants "from introducing evidence that they were pressured by other co-defendants to engage in the conduct alleged in the indictment" where defendants had made no attempt to make out the elements of a duress defense).

There has been no evidence or suggestion in this case that either the defendant or his employer were threatened with any physical harm if they did not participate in the bribery

50

scheme or were otherwise subject to pressure constituting duress.  Any argument or evidence that they were extorted or had no choice but to pay the bribes would be legally irrelevant, waste time, and serve only to confuse the issues and invite jury nullification.  The defendant should therefore be precluded from arguing or suggesting to the jury that he was extorted by Ghanaian officials or had no choice but to pay them bribes.

X.      The Court Should Preclude the Defendant From Arguing That He Did Not Obtain an Improper Business Advantage or Did Not Succeed in Obtaining or Retaining Business

The Court should also preclude the defendant from arguing or otherwise suggesting to the jury that he, the Bank, or the Turkish Energy Company did not obtain any improper business advantage in exchange for the bribes that he and his co-conspirators paid to Ghanaian officials, or that any such business advantage they received was insignificant.  The government expects that the defendant may make such an argument, including because the Bank did not ultimately finance the project as originally contemplated.  But the FCPA prohibits offering to pay a bribe, authorizing payment of a bribe, or paying a bribe even if the corrupt scheme is unsuccessful and even if the defendant and his coconspirators in fact obtained no business advantage at all.  Thus, any argument that the defendant, the Bank, or the Turkish Energy Company did not receive an improper business advantage—or that any business advantage they obtained was insignificant—should be precluded because it would be irrelevant and would serve only to confuse the jury and invite jury nullification.

The FCPA prohibits a domestic concern or U.S. citizen like the defendant from offering, paying, promising to pay, or authorizing bribes "for purposes of" influencing a foreign official's actions or securing an improper business advantage.  15 U.S.C. § 78dd-2(a)(1)(A), (a)(1)(B) (listing four prohibited purposes) (emphasis added); see also 15 U.S.C. § 78dd-2(a)(2)(A), (a)(2)(B) and (a)(3)(A), (a)(3)(B) (same in relevant part).  In addition, the payment

51

must have been made "in order to" assist the domestic concern or U.S. citizen in obtaining, retaining or directing business.  15 U.S.C. § 78dd-2(a)(1) (emphasis added), (a)(2), (a)(3); see also 15 U.S.C. § 78dd-2(a)(2), (a)(3) (same in relevant part).[19]  Thus, as both the underlined phrases above make clear, what matters under the FCPA is "the result [that payments] are intended to produce," United States v. Kay, 359 F.3d 738, 743 (5th Cir. 2004) (emphasis added), not whether the payments actually produced that result.  In other words, it is no defense to an FCPA charge (nor, quite obviously, to an FCPA conspiracy charge) that a bribe payment did not have its intended result and did not, in fact, result in a business advantage.  Instead, as the statute's text makes plain, "the proper focus is on [the defendant's] intent."  United States v. Kozeny, 582 F. Supp. 2d 535, 541 (S.D.N.Y. 2008).  And indeed, the parties agree that the Court should instruct the jury that "it is not necessary that any person or company actually obtained or retained any business, improper advantage or influence with a foreign government" through the scheme.  See ECF Dkt. No. 65 at 54.

Accordingly, any argument that Ghanaian officials did not, in fact, provide Berko, the Bank, or the Turkish Energy Company with any improper business advantage, or that any assistance or information that they provided was minor or insignificant, would be irrelevant, serve only to confuse the jury and be unduly prejudicial.  The Court should preclude the defendant from arguing otherwise.

---

[19]    The same prohibitions apply to an agent or employee of an issuer under 15 U.S.C. § 78dd-1(a) where such offer, payment, promise to pay, or authorization was made in order to assist the issuer in obtaining, retaining, or directing business.

XI.    The Court Should Preclude the Defendant from Arguing that the Payments in this Case were for "Routine Governmental Action" Absent an Offer of Proof

As alleged in the Indictment, the defendant conspired to bribe Ghanaian officials to approve a multi-million dollar contract to build a power plant in Ghana.  Approval of the Power Plant required sign-off from high level officials in the Ghanaian Ministry of Power, the President of Ghana's cabinet, the Ghanaian Parliament, and several Ghanaian instrumentalities, including, for instance, ECG, Ghana's state-owned utility company.  None of these approvals constitute "routine governmental action" under the FCPA, which is limited to nondiscretionary actions taken by low-level officials.  The defendant should be precluded from suggesting otherwise to the jury in his opening statement absent an offer of proof showing some good faith basis to argue that any of the official acts charged in the indictment constitute "routine governmental action," as defined in the FCPA.

The FCPA contains an exception for "any facilitating or expediting payment to a foreign official . . . the purpose of which is to expedite or to secure the performance of a routine governmental action by a foreign official[.]"  15 U.S.C. §§ 78dd-1(b), 78dd-2(b).  But "routine governmental action" is narrowly defined as "only an action which is ordinarily and commonly performed by a foreign official," such as "processing governmental papers," providing certain basic governmental services, and "obtaining permits, licenses, or other official documents to qualify a person to do business in a foreign country." Id. §§ 78dd-1(f)(3)(A) and 78dd-2(h)(4)(A) (emphasis added).  The statute expressly provides that "routine governmental action" does not include "any decision by a foreign official whether, or on what terms, to award new business to or to continue business with a particular party, or any action taken by a foreign official involved in the decisionmaking process to encourage a decision to award new business to or continue business with a particular party."  15 U.S.C. § 78dd-1(f)(3)(B).  Thus, as other courts have explained, the

53

facilitation payments exception is "very narrow;" it applies to "largely non-discretionary, ministerial activities performed by mid- or low-level foreign functionaries." United States v. Kay, 359 F.3d 738, 751 (5th Cir. 2004).  And, as the Eleventh Circuit has explained, the exception applies generally to payments for services performed by the government, such as visas, and not payments made to secure a contract or other opportunity to provide goods or services to the government.  United States v. Duperval, 777 F.3d 1324, 1334 (11th Cir. 2015) ("The text of the statute refers to the government providing a service to a person or business, not to the government administering contracts with companies that provide telephone service.").

The scheme alleged in the Indictment does not involve payments to officials to obtain non-discretionary approvals or other ministerial acts.  To obtain the EPA, the Turkish Energy Company required approvals from senior levels of government, including the Ghanaian Ministry of Power, the Ghanaian cabinet, and, ultimately, the Ghanaian parliament.  None of these entities had an obligation to approve the EPA.  In fact, the approvals were quintessentially discretionary, as will be demonstrated at trial through evidence of, among other things, the lengthy negotiations between the Turkish Energy Company and Ghanaian officials.[20]  The defendant worked with several Ghanaian intermediaries to facilitate bribes to secure approval of the EPA, in addition to paying bribes himself.

Nonetheless, the defendant has requested that the Court instruct the jury on the "routine governmental action" exception, see ECF Dkt. No. 65 at 68–71, and the government anticipates that the defendant may attempt to argue that payments made by the conspirators fall within the exception.  The government is not aware of a basis in the evidence, however, to argue

---

[20]     Moreover, the EPA also required approvals from and agreements with several instrumentalities of the Ghanaian government, including ECG, GridCo, and Purc, which were discretionary.

54

that the approvals of the EPA constitute "routine governmental action."  While the evidence will show that Co-Conspirator 1 assisted the Turkish Energy Company with procuring entry visas and certain licenses and was compensated for doing so, the government does not contend that this work, if actually completed, was the result of a violation of the FCPA.  To the contrary, the indictment alleges at least $700,00 in bribes to secure the assistance of foreign officials in "ensuring that Turkish Energy Company was successful in winning the bid to build and operate the Power Plant."  Indictment ¶ 19.  For instance, as alleged, in April 2015, the Turkish Energy Company transferred approximately $500,000 to Ghana Consulting Company 2 to effectuate a bribe payment to a high-ranking MoP official in order to secure approval of the EPA.  See Indictment ¶¶ 33–34.  Whether Co-Conspirator 1 also provided some legitimate services, such as procuring visas, does not bear on whether Co-Conspirator 1 paid bribes to secure approval of the EPA.  In short, the "routine governmental action" exception is irrelevant to this case: the approvals the government contends were corruptly obtained could not constitute "routine governmental action" and the government does not contend that conduct that might fall within the exception, such as procuring visas, involved bribery.  Accordingly, describing to the jury the "routine governmental action" exception—and the related "exception to the exception" for new and continuing business—will waste time and potentially confuse the jury, which may incorrectly conclude that they need to decide whether approving the EPA constituted "routine governmental action."

Untethered to any competent evidence, the Court should preclude the defendants from arguing in opening statements that the payments alleged in the Indictment are somehow "routine governmental action."  To raise this potential exception to the jury during opening statements, counsel must have a good faith basis that an admissible document or testimony will

55

support that such exception might apply. See McConaughey v. Port Auth. of New York & New Jersey, No. 21-CV-6137 (RA), 2025 WL 1927502, at *3 (S.D.N.Y. July 14, 2025) ("If Defendant has a good-faith basis to believe that any witness will provide testimony to that effect, it shall so advise the Court. Otherwise, Defendant may not reference such issues during its opening statement"); United States v. Lauersen, No. 98-CR-1134 (WHP), 2000 WL 1693538, at *8 (S.D.N.Y. Nov. 13, 2000) ("However, absent a good-faith basis, Binion's counsel may not present evidence or arguments on Binion's behalf that directly contradict specific factual assertions summarized in the FBI-302."). Unless counsel can proffer a legitimate evidentiary basis for such an argument, the defendant should, at a minimum, be precluded from referencing such a theory in his opening statement. Raising this issue in his opening when it will not and cannot be supported by admissible evidence would confuse the jury and prejudice the government.

XII.    The Court Should Preclude the Defendant From Offering Evidence or Argument Regarding his Family Background, Connections to the United States, and Other Similar Personal Factors

The Court should preclude the defendant from offering evidence or argument concerning (i) his family circumstances; (ii) his nationality and minimal or lack of connections to the United States; and (iii) other similar personal factors such as health condition and age.

Evidence is admissible only if it is relevant. See Fed. R. Evid. 401. Moreover, "[d]istrict courts have broad discretion to balance the probative value of evidence against possible undue sympathy or bias as well as prejudice." United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009). Courts have broad discretion to exclude evidence if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one[.]" Fed. R. Evid. 403, Adv. Comm. Notes.

When evidence is of limited probative value, it should be excluded if it has the "potential to engender sympathy in an inappropriate effort to excuse defendant's commission of

56

the charged offenses." Miller, 641 F. Supp. 2d at 167; see also United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that the defendant had son with cerebral palsy); United States v. Kaufman, No. 19-CR-504 (LAK), 2021 WL 51521, at *2 (S.D.N.Y. Jan. 6, 2021) (precluding evidence and argument "concerning defendant's family background, health conditions, other personal factors unconnected to guilt or innocence" because it would "would invite the jury to determine the case on the basis of factors that are not relevant to guilt or innocence"); United States v. Battaglia, No. 05-CR-774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); United States v. Harris, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

Courts have precluded evidence related to the personal characteristics of the defendant when they "do not bear on the Defendant's innocence or guilt." See United States v. St. Rose, No. 11-CR-349 (SJ), 2012 WL 1107659, at *1 (E.D.N.Y. Apr. 2, 2012) (precluding defendant from arguing she should be acquitted out of sympathy for her, her family, or her immigration status); Battaglia, 2008 WL 144826 at *3 (granting a motion in limine to preclude evidence of the defendant's personal status); see also United States v. Sterritt, No. 21-CR-193 (KAM), 2023 WL 7386660, at *4 (E.D.N.Y. Nov. 8, 2023) ("Courts have broad discretion concerning the admissibility of evidence related to the defendant's personal, health, or family circumstances, but particularly where such evidence 'has limited probative value . . . [and has] potential to engender sympathy in an inappropriate effort to excuse [a] defendant's commission of the charged offenses,' such evidence may be excluded, pursuant to Fed. R. Evid. 403").

57

Details about the defendant's family circumstances or the length of time he has been separated from his family have no bearing on the issues in this case because they are not probative of whether the defendant engaged in bribery and money laundering conspiracies. The risk of juror confusion and unfair prejudice is manifest because the jury would be asked to look past the defendant's conduct in this case. This sort of improper appeal to the jury should be excluded under Rule 403.

Additionally, arguments suggesting the defendant's nationality in some way led to his prosecution are inaccurate, improper and should be precluded.[21] Any argument that the defendant's nationality had bearing on his indictment by a federal grand jury has no basis in fact, would distract from the actual evidence at trial, and would amount to nothing more than an attempt at nullification. For these reasons, any argument by the defendant that he is being prosecuted for being a Ghanaian national (in addition to a U.S. citizen) should be precluded. See United States v. Stewart, No. 03-CR-717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting" defendant); see also United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997) (a "selective prosecution defense is an issue for the court rather than the jury"). Further, to the extent the defense tries to introduce evidence concerning the defendant's nationality and his lack of personal connections to the United States to create undue sympathy from the jurors or suggest that the United States government should not be expending resources on this case, the Court should preclude such evidence and argument as irrelevant and unfairly prejudicial.

---

[21]     Given the obvious impropriety of any such argument, the government does not assume the defendant will raise it, but the government makes this motion in an abundance of caution.

XIII.    The Court Should Preclude Evidence or Argument Concerning Possible
         Punishment and Collateral Consequences

The government moves to preclude any discussion or argument concerning possible consequences or punishment which may result from a conviction in this case. Such argument or evidence is irrelevant and therefore inadmissible.

Where the jury has no role at sentencing—such as in this case—it "should be admonished to reach its verdict without regard to what sentence might be imposed." Shannon v. United States, 512 U.S. 573, 579 (1994). This is for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their fact finding responsibilities, and creates a strong possibility of confusion." Id. Ultimately, any reference during trial to possible punishment may only "prejudice, distract, or confuse the jury." United States v. Jadusingh, No. 18-CR-257 (KAM), 2020 WL 207950, at *3 (E.D.N.Y. Jan. 14, 2020). Accordingly, "[f]ederal courts usually instruct juries not to consider a verdict's consequences." United States v. Blume, 967 F.2d 45, 49 (2d. Cir. 1992).

The Court should preclude the defendant and his counsel from referencing the possible punishment or consequences which will accompany a guilty verdict. For instance, the defendant should not be permitted to refer to the gravity of potential consequences for the defendant if he is convicted, or make arguments that allude to potential punishment, such as that the defendant is "on trial for his life." Although the defendant has not stated his intention to reference the possible consequences of his conviction at trial, the government moves to preclude any mention of sentence out of an abundance of caution, and any collateral impact it may have on other proceedings. Any allusions to possible punishment or consequences for the defendant if he is convicted will serve to confuse the jury and undermine its role as the trier of fact. Discussion of the consequences of a conviction could invite the jury to consider nullification, a violation of

59

the Court's instructions and an outcome the Court is duty bound to prevent.  Thomas, 116 F.3d at 616.  Therefore, the Court should preclude the defendant from referencing or alluding to potential punishment or consequences of conviction at trial.

XIV.  The Court Should Order the Defendant to Disclose Rule 16(b) Discovery and Preclude Introduction of Exhibits Not Disclosed

The defendant has not produced any documents or records in Rule 16 discovery notwithstanding the government's numerous requests for reciprocal discovery over the last two years.  To date, the trial exhibits marked by the defendant include only documents the government produced to him in Rule 16 discovery.  The Court should order the defendant to produce any reciprocal discovery immediately, and preclude the defendant from marking exhibits that have not been disclosed in Rule 16 discovery by July 6, 2026.

Rule 16(b) of the Federal Rules of Criminal Procedure governs a defendant's disclosures in a criminal case.  In relevant part, it requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A).  Rule 16 does not require a defendant to disclose documents he intends to use for purposes of cross-examining a government witness.  However, to the extent that a defendant seeks to admit into evidence a document while cross-examining a witness during the government's case-in-chief in order to affirmatively support the defendant's theory of the case, such a document falls within the ambit of Rule 16.  As explained in United States v. Hsia, No. 98-CR-0057 (PLF), 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000):

A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense."  BLACKS LAW DICTIONARY 207 (7th ed. 1999). "Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense . . . . The cross-examination of

60

these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case." Hsia, 2000 WL 195067, at *2. The Hsia court distinguished documents introduced by a defendant via a government witness—which do fall within Rule 16 and should be disclosed—from documents used by a defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, it is not part of [the defendant's] case-in-chief." Id. at *2 n.1. See also United States v. Napout, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017). "Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant.").

When a defendant, like Berko, fails to timely disclose to the government under Rule 16, the Court may exclude those exhibits as untimely. See id. That is because, as Judge Chen explained in Napout: "[W]here a defendant cross-examines a government witness to buttress[ ] her theory of the case, rather than to impeach the testimony given by the witness on direct examination, [t]he cross-examination ... is properly seen as part of the defendant's case-in-chief." Id. at *7 (internal quotation marks and citation omitted). Indeed, "this interpretation of Rule 16 has been adopted by almost every district court to consider the issue." Id. (citing Hsia, 2000 WL 195067, at *2); United States v. Swenson, 298 F.R.D. 474, 478 (D. Idaho 2014); United States v. Holden, No. 13-CR-444, 2015 WL 1514569, at *5 (D. Or. Mar. 19, 2015); United States v. Larkin, No. 12-CR-319 (JCM) (GWF), 2015 WL 4415506, at *6 (D. Nev. July 20, 2015); United States v. Aiyaswamy, No. 15-CR-568 (LHK), 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017)).

The parties are approximately 5 weeks out from trial. The defendant has not produced a single document pursuant to his reciprocal discovery obligations. The government

61

respectfully requests that the Court order the defendant to identify and produce in Rule 16 discovery all documents and records he intends to use as case-in-chief exhibits by July 6, 2026 or be precluded from using them at trial.  See, e.g., Giffen, 379 F. Supp. 2d at 344 (directing defendant to provide trial exhibit list and copies of exhibits to government "at the start of trial or no later than thirty days prior to the start of the Defendant's case"); see also United States v. Mavashev, No. 08-CR-902 (DLI), 2010 WL 670083, at *4 (E.D.N.Y. Feb. 23, 2010) ("[T]o the extent defendant intends to use any documents, objects, reports of examinations, or tests in his case-in-chief at trial, he is ordered to comply with the government's request immediately, i.e., no later than twenty-four (24) hours following the issuance of this Order.  Failure to do will result in such evidence being precluded.  See Fed. R. Crim. P. 16(d)(2)(C)"); United States v. Weiss, 930 F.2d 185, 199 (2d Cir. 1991) (district court did not abuse its discretion in precluding evidence during trial because "[d]efense counsel planned to use the documents in their case-in-chief and was obliged to disclose the documents under Rule 16(b)[;] . . . .  Permitting the defense to use the documents, particularly without the prosecution ever having seen them and despite the earlier government requests for those documents, would have given the defense an unfair advantage."); United States v. Jasper, No. 00-CR-825 (PKL), 2003 WL 223212, at *1 (S.D.N.Y. Jan. 31, 2003) (ordering the defendant to "comply with his obligations as set forth in Rule 16(b)(1)(A) and produce any materials that he intends to use in defendant's case-in-chief at trial.").

XV.   The Government Provides Notice that It Will Seek to Admit Party-Opponent and Co-Conspirator Statements and Object to Them If Offered by the Defendant

The government intends to introduce at trial numerous out-of-court statements made by the defendant and/or co-conspirators through documentary evidence (including communications retrieved from email accounts of Berko's co-conspirators), and to a lesser extent

through witness testimony.[22]   The evidence at trial will establish by a preponderance that the declarants were part of a conspiracy with the defendant, and that the statements the government seeks to admit were made in furtherance of the conspiracy.  As explained below, the government does not ask the Court to rule on the admissibility of any particular emails or other out-of-court statements by co-conspirators that the government intends to offer at this time, but merely provides notice of the types of co-conspirator statements the government will seek to introduce at trial.[23]

In addition, the government moves the Court to preclude the defendant from admitting his own statements or statements made by his co-conspirators, either on cross-examination or in his case-in-chief, because such testimony would constitute hearsay not subject to any exception.

A.    The Government Should Be Permitted to Introduce the Defendant's Statements and the Statements of His Co-Conspirators on a Conditional Basis

1.    Applicable Law

a.    Rule 801(d)(2)(E)

Rule 801(d)(2)(E) excludes from the definition of hearsay "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy."  A co-conspirator statement is admissible if the court finds by a preponderance of the evidence that (1) the conspiracy

---

[22]    Most of the percipient witnesses to the charged crimes reside outside of the United States and are thus beyond the subpoena power, and many of these individuals have criminal exposure in this matter making it likely that they would invoke their Fifth Amendment right not to testify, even if the government could compel their appearance.

[23]    The government intends to introduce many of Berko and his co-conspirators' communications through a publication witness.  Before that witness testifies, the government intends to provide the Court and defense counsel a chart of the party-opponent and co-conspirator statement documents that the government seeks to introduce.  The government intends to model its chart on the one produced to the Court in United States v. Cherwitz, et al., No. 23-CR-146 (DG) (E.D.N.Y.).  The government expects that the number of documents introduced through the publication witness in this case will be substantially more than that introduced in Cherwitz.

existed at the time the statement was made; (2) both the declarant and the non-offering party were part of the conspiracy; and (3) the statement was made in furtherance of the conspiracy. Bourjaily v. United States, 483 U.S. 171, 175–81 (1987); see also United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1998).

With respect to the first requirement, "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment" or the subject of the relevant trial. Gigante, 166 F.3d at 82. "In fact, the Second Circuit has held that it is not even necessary that the Government charge a conspiracy to take advantage of Rule 801(d)(2)(E)." United States v. Ulbricht, 79 F. Supp. 3d 466, 483-84 (S.D.N.Y. 2015) (citing United States v. DeVillio, 983 F.2d 1185, 1193 (2d Cir. 1993)); see also United States v. Maldonado-Rivera, 922 F.2d 934, 962 (2d Cir. 1990) ("Though . . . Fed. R. Evid. 801(d)(2)(E) requires proof that both the declarant and the party against whom a declaration is offered be members of the same conspiracy, it does not require that the conspiracy be one charged in the indictment.") (citation omitted).

Importantly, nothing in the text of Rule 801(d)(2)(E) or in caselaw interpreting the Rule's scope requires that a statement be communicated to any other member of the conspiracy to qualify as a co-conspirator statement, so long as it was made during and in furtherance of the conspiracy and is admitted against a member of the conspiracy. See, e.g., United States v. Fawwaz, 694 F. App'x 847, 851 (2d Cir. 2017) (holding that list containing "information regarding the current status of the conspiracy and its membership [was] sufficiently in furtherance of a conspiracy"); United States v. Ashraf, 320 F. App'x 26, 29 (2d Cir. 2009) (internal citation and quotation marks omitted) (affirming admission of drug ledgers pursuant to Rule 801(d)(2)(E)); United States v. Donovan, 55 F. App'x 16, 22 (2d Cir. 2003) (affirming admission of a ledger and

64

a list, each kept by individual conspirators, during the course of securities fraud conspiracy to track certain commission payments, thereby "further[ing] the operations and efficiency of the conspiracy").

As to the "requirement that the challenged statement be 'in furtherance of' the conspiracy," it "is satisfied if the statement's objective is 'designed to promote or facilitate achievement of the goals of the conspiracy.'" United States v. Malka, 602 F. Supp. 3d 510, 533 (S.D.N.Y. 2022) (quoting United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994)). Courts in this district have repeatedly held that this standard "is not very restrictive." See, e.g., United States v. Kurland, No. 20-CR-306 (S-1) (NGG), 2022 WL 2669897, at *3 (E.D.N.Y. July 11, 2022). Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." United States v. Tarantino, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide an update as to the status or progress of the conspiracy, see United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001), United States v. Russo, 302 F.3d 37, 46 (2d Cir. 2002); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," Maldonado-Rivera, 922 F.2d at 958 (citation omitted); (3) "seek to induce a co-conspirator's assistance," Desena, 260 F.3d at 158 (internal quotation omitted); (4) "provide reassurance," id.; (5) "serve to foster trust and cohesiveness," id.; United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, United States v. Diaz, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his coconspirators," United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989); United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987).

65

Relatedly, the Second Circuit has held that a status update is sufficient to satisfy the "in furtherance" requirement of Rule 801(d)(2)(E).  United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994); see also United States v. Stewart, 433 F.3d 273, 293 (2d Cir. 2006) (holding that the statement need not actually further the conspiracy, but instead need only be made with the intent to further some objective of the conspiracy); United States v. Schlesinger, 372 F. Supp. 711, 720 (E.D.N.Y. 2005).  Notably, "[a] statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy."  Malka, 602 F. Supp. 3d at 535; accord Neumann, 2023 WL 8700974, at *3; United States v. Weingarten, No. 19-CR-497 (NSR), 2024 WL 677995, at *12 (S.D.N.Y. Feb. 15, 2024).

A narrative description of a past event is also admissible pursuant to Rule 801(d)(2)(E) if it serves "some current purpose in the conspiracy."  United States v. Thai, 29 F.3d 795, 813 (2d Cir. 1994).  Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group."  United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotation marks omitted); see also United States v. Lozano-Reyes, 101 F.3d 686, 1996 WL 313934 at *2 (2d Cir. 1996) (affirming admission of co-conspirator statements regarding past events because they served "to engender trust, to increase [the witness's] familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits"); United States v. Salerno, 868 F.2d 524, 535-37 (2d Cir. 1989) (finding co-conspirator statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators).

In addition, acts taken to conceal an ongoing conspiracy are acts in furtherance of that conspiracy and, therefore, are relevant and admissible at trial.  See United States v. Eisen, 974

66

F.2d 246, 269 n.8 (2d Cir. 1992) ("[C]learly, acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy."); United States v. Kahale, 789 F. Supp. 2d 359, 384 (E.D.N.Y. 2009) (holding that "an act taken to conceal an ongoing illegal agreement . . . constitutes an act in furtherance of the charged conspiracy, and is admissible"); United States v. Mermelstein, 487 F. Supp. 2d 242, 261 (E.D.N.Y. 2007) ("Efforts to conceal an ongoing conspiracy may properly be charged as overt acts in furtherance of it."). This includes statements made in an attempt to "silence witnesses" in an ongoing conspiracy, which also "further[] the goals of the conspiracy." United States v. Arrington, 867 F.2d 122, 130 (2d Cir. 1989).

            b.      Conditional Admission of Co-Conspirator Statements

As the Second Circuit explained in United States v. Geaney, 417 F.2d 1116 (2d Cir. 1969), "statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of" the requirements of Rule 801(d)(2)(E). United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993); see also United States v. Shyne, No. S4 05-CR-1067 (KMK), 2007 WL 1075035, at *34 (S.D.N.Y. Apr. 5, 2007) ("A trial court need not . . . make these determinations prior to trial."). This practice is "well-settled" in this circuit, see United States v. Labate, No. 00-CR-632 (WHP), 2001 WL 533714, at *21 (S.D.N.Y. May 18, 2001), and avoids the need for a "mini-trial, significantly prolonging the proceedings in the case and affording the defendants a complete preview of the government's evidence," United States v. Ianniello, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985).

            2.      Discussion

The government expects to prove that the defendant and the following individuals, among others, were part of a conspiracy to bribe Ghanaian officials to secure a power plant deal for the Turkish Energy Company with the Government of Ghana: Co-Conspirator 1; Co-Conspirator 2; Co-Conspirator 3; Co-Conspirator 4; and Ghana Official 1. The government's

67

proof that these individuals were part of a conspiracy with Berko largely consists of correspondence amongst these individuals about how to secure the necessary approvals for the Power Plant project from government officials and, more explicitly, about promises to pay government officials to facilitate these approvals. As one example, the government intends to introduce a series of emails, including those listed below, from April 2015—in the weeks leading up to May 12, 2015 when the Senior Ghana Official signed the EPA on behalf of the MoP—in which the conspirators discuss sending payment to Ghana Official 1, an individual who reported to Senior Ghana Official:

- April 14, 2015 email from Co-Conspirator 4 to Co-Conspirator 1 and Berko (on his personal account), in which Co-Conspirator 1 writes: "invoice 1 for 500k . . . invoice 2, 1.5m at signature . . . invoice 3, 1.5 at LC . . . invoice 4, 1.5 at commissioning and start of operation[,]" and attaches a sham invoice—"invoice 1"—for $500,000 from Ghana Consulting Company 2 to the Turkish Energy Company. GX-6140, 6140-A.

- April 19, 2015 email from Co-Conspirator 1 to Co-Conspirator 3, copying Berko on his personal email account, asking that Co-Conspirator 3: "[k]indly arrange for the first 500k$ to be in Ghana this week. … The intended recipient is on my case. … Please make arrangements to have the 1.5m$ also here in Ghana no later than end of this week or early part of the following. I am going to part with 250k$ to [Ghana Official 1] on the basis that I will receive the same in due course. This will represent part payment to [Ghana Official 1] as discussed." GX-6272.

- April 19, 2015 response from Co-Conspirator 3 to Co-Conspirator 1 and Berko: "I have an invoice for 500k. That's what you are referring to right, to be paid within this week? Then, [a]s far as I know, 1m at signing and 1.5 m at LC. I will speak with [Co-Conspirator 2] tomorrow abt the payment. Why is there no news from [Ghana Official 1] abt extension or meeting on Tuesday, any news you can share?" GX-6273.

- April 19, 2015 email from Co-Conspirator 1 to Co-Conspirator 3 and Berko, stating in relevant part: "500 now!!! Very urgent. 1.5 on signing and 1.5 on LC. As stated, I am getting concerned with [Ghana Official 1] and his resistance. I've decided to sort him out this week following recent developments and would advise that you have the same ready for me immediately upon signature. Let there be no delays. Please." GX-6274.

- April 20, 2015 email from Co-Conspirator 3 to Co-Conspirator 1 and Berko: "Money is ready, [Co-Conspirator 2] wants to talk to [Co-Conspirator 4] and [Presidential Relative] on Tuesday before sending." GX-6275.

- April 20, 2015 email from Co-Conspirator 3 to Co-Conspirator 1 and Berko: "500 k is coming today or tomorrow. Pls pay [Ghana Official 1] . . . ." GX-6278.

The above communications are just examples of the type of communications that establish that Berko, Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 4, and Ghana Official 1 were part of a conspiracy to bribe government officials to obtain the required approvals for the Turkish Energy Company's Power Plant project.

Examples of the categories of documents and statements the government intends to introduce as party-opponent statements and co-conspirator statements in furtherance of the conspiracy include:

- Emails from Berko and his co-conspirators to members of the deal team at the Bank about the status of the Power Plant project and the necessary approvals for the project;

- Communications among the co-conspirators using personal email accounts about the necessity of the bribe payments;

- Communications among the co-conspirators using personal email about how to fund the bribe payments;

- Emails from Berko and his co-conspirators to representatives of the Bank concealing Co-Conspirator 1's true role in the Power Plant deal; and

- Emails from Berko and his co-conspirators to representatives of the Bank concealing Ghana Consulting Company 1's role in the Power Plant deal.

The government does not ask the Court to rule on the admissibility of any particular emails or other out-of-court statements by co-conspirators that the government intends to offer at this time, but merely provides notice of the types of co-conspirator statements the government will seek to introduce at trial. Accordingly, consistent with the practice in this district and Second Circuit law, the Court should admit these statements at trial on a conditional basis.

B.      The Defendant's Statements and Co-Coconspirators' Statements Are Inadmissible If Offered by the Defendant

The Court should preclude the defendant from admitting other statements or portions of statements made by the defendant, his agents or co-conspirators, either on cross-examination or in his case-in-chief, because such testimony would constitute hearsay not subject to any exception.

1.      Applicable Law

It is well established that a defendant generally is prohibited from introducing his own out-of-court statements at trial.  See United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("[W]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); United States v. Blake, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible.").  Therefore, a "court may . . . exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible hearsay."  United States v. Mahaffy, No. 05-CR-613 (ILG), 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007).  Were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury."  United States v. McDaniel, 398 F.3d 540, 545 (6th Cir. 2005).

Nor, except in extremely limited circumstances, may a defendant introduce his own out-of-court statements as evidence of his state of mind.  The state-of-mind exception to the hearsay rule allows into evidence "[a] statement of the declarant's then-existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed."  Fed. R. Evid. 803(3).  The state of mind must be relevant, and the statement cannot be offered for any

70

underlying truth independent of the state of mind. See Funk v. Belneftekhim, No. 14-CV-0376 (BMC), 2018 WL 11169575, at *3 (E.D.N.Y. Nov. 30, 2018) (denying admission of statements under Rule 803(3) because "[n]either statement shows [declarant's] knowledge or state of mind independent from the truth of what it asserts and it is not clear how [declarant's] state of mind is relevant."). "The exclusion of 'statement[s] of memory or belief [proffered] to prove the fact remembered or believed' is necessary to prevent the exception from swallowing the hearsay rule. This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." United States v. Cardascia, 951 F.2d 474, 487 (2d Cir. 1991).

Finally, a defendant also may not admit his agents' or co-conspirators' statements under Rules 801(d)(2)(D) or (E). Such statements are not "opposing party" statement as to a defendant. Thus, for example, courts have held that the "co-conspirator exception is a one-way street down which only the government may travel." United States v. Persico, No. 04-CR-911 (SJ), 2006 WL 3246922, at *1 (E.D.N.Y. Nov. 8, 2006); see also United States v. James, No. 02-CR-778 (SJ), 2007 WL 2702452, at *1 (E.D.N.Y. Sept. 12, 2007) (a co-conspirator statement made "during the course and in furtherance of the conspiracy is one type of '[a]dmission by party-opponent' defined as nonhearsay, but only if 'offered against' the party. The statement of a co-conspirator, offered for its truth by a co-conspirator, does not fall within this Rule.").

2.    Discussion

The defendant has marked as trial exhibits numerous emails for which there is no apparent non-hearsay purpose or applicable exception to the rule against hearsay. The Court should preclude the defendant from introducing these documents.

The defendant has also marked numerous exhibits that contain his own self-serving hearsay statements. See, e.g., DX-199, DX-201, DX-216, DX-218, DX-238, DX-240, DX-255,

71

DX-264, DX-264, DX-265, DX-266, DX-267, DX-268, DX-290.  For instance, DX-199 (Exhibit F) is an email from the defendant to Bank employees, in which Berko explains in a lengthy summary "how the contract was won in the first place, what was the process, who bidders were, on what merits [Turkish Energy Company] won, etc."  The defendant is prohibited from introducing this email to establish how the Turkish Energy Company secured the Power Plant deal with the GoG.  See Marin, 669 F.2d at 84 ("[W]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible.").  DX-218 (Exhibit G) is another example of the same issue.  It is an email exchange between Berko and Co-Conspirator 4, in which Berko recaps his understanding of the status of negotiations between the Turkish Energy Company and Ghana Consulting Company 1.  Berko cannot introduce his out-of-court statements to prove what the Turkish Energy Company or Ghana Consulting Company 1 agreed to.  DX-238 (Exhibit H) is an email exchange between Berko, Co-Conspirator 1 and Co-Conspirator 2, in which the participants discuss the terms of a potential agreement between the Turkish Energy Company and Ghana Consulting Company 1.  Regarding a specific contract term that was being negotiated, Berko wrote: "We will never sign that and if you do take it that I am resigning from the project for good."  Ex. H at 1 (top email).  Berko cannot introduce this email to prove that he threatened to resign from the project.  In general, a defendant may not "attempt to get [his] side of the . . . story in front of the jury without him testifying and opening him up to cross-examination."  United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004).

The defendant has also marked dozens of emails, including communications between his co-conspirators, that he did not send or receive .  See, e.g., DX-131, DX-137, DX-139, DX-146, DX-182, DX-183, DX-190, DX-192, DX-193, DX-194, DX-195, DX-197, DX-198, DX-203, DX-204, DX-205, DX-207, DX-208, DX-211, DX-212, DX-214, DX-215, DX-217, DX-

72

239, DX-245, DX-263, DX-280, DX-298, DX-292.[24]  Because the defendant is not on these communications, they could not be admitted for their effect on him; rather, the sole purpose of introducing these communications would be apparently to establish the truth of their contents.  For instance, many of these documents appear to relate to work Co-Conspirator 1 may have done for the Turkish Energy Company.  See, e.g., DX-190 (Exhibit I); DX-195 (Exhibit  J); DX-211 (Exhibit K), DX-245 (Exhibit L).  But the defendant may not introduce these hearsay documents to establish that Co-Conspirator 1 in fact did legitimate work—in addition to facilitating and paying bribes—for which he would be owed compensation.  These documents depend for their relevance on the truth of the communications and the law is clear that the defendant cannot admit co-conspirator statements for their truth.  See James, 2007 WL 2702452, at *1; Persico, 2006 WL 3246922, at *1.  Similarly, the defendant may not introduce hearsay statements of his co-conspirators to establish that Co-Conspirator 1 hired subcontractors on behalf of the Turkish Energy Company or that Co-Conspirator 1 and the defendant were otherwise owed reimbursement from the Turkish Energy Company.  See, e.g., DX-197 (Exhibit M); DX-204 (Exhibit N); DX-205 (Exhibit O); DX-214 (Exhibit P), DX-217 (Exhibit Q).

While the government is not aware precisely which of the marked emails the defendant might seek to introduce, the government respectfully submits that the Court should preclude the defendant's efforts to evade the hearsay prohibition.

---

[24]    Many of these exhibits are in Turkish.  See, e.g., DX-212, DX-239, DX-245, DX-263, DX-280, DX-298, DX-292.

XVI.    The Court Should Admit the Defendant's Proffer Protected Statements at Trial If the Waiver Provision of the Proffer Agreement Is Triggered

The government writes to inform the Court of its intent to introduce the defendant's proffer statements at trial in its case-in-chief or rebuttal case in the event the defendant or his counsel offer evidence or make arguments that trigger the "waiver provision" of the defendant's proffer agreement. This issue, by its nature, often requires a district judge to determine the admissibility of proffer-protected statements mid-trial. In an effort to aid the Court, the government details below the bounds of the waiver provision.

A.    Background Regarding Berko's Proffer with the Government

Berko met with the government on May 18, 2017. The meeting was pursuant to a proffer agreement, which provided certain protections against the government's use of any such statements in its case-in-chief at trial. See Proffer Agreement (GX-7054), attached hereto as Exhibit R. The proffer agreement that Berko signed with the government provided, in what is commonly referred to as the "waiver" provision, that the government may use Berko's proffer-protected statements "as substantive evidence to cross-examine [Berko], should [Berko] testify," and to "rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [Berko]" at trial or other proceeding. Exhibit R at ¶ 4.

During his meetings with the government Berko made certain factual admissions that are relevant to his guilt.[25] For example, he identified Ghana Official 1 as the Technical Advisor to the Minister of Power and noted that Ghana Official 1 was part of Turkish Energy Company's EPA negotiation process. See FBI-302 from May 18, 2017, attached as Exhibit S, at 8. He identified certain email accounts as belonging to his co-conspirators. See id. at 6, 8. He

---

[25]    Berko also made other statements, including various false exculpatory statements.

74

further admitted he participated in key meetings with government officials throughout the EPA negotiations. See id. at 7–9. He further explained how his employer (the Bank) would profit from the Turkish Energy Company transaction. Id.

    B.    The Government Will Seek to Admit Berko's Proffer Statements If He or His Counsel Trigger the Waiver Provision

Should Berko or his counsel offer evidence or make arguments that trigger the "waiver" provision of the proffer agreements, the government will seek to introduce Berko's proffer statements at trial through an FBI agent who was present for the interviews. Under Second Circuit precedent, it is well-established that "[s]pecific or direct contradiction between [a defendant's] proffer statement and an assertion by counsel" is not required to trigger the waiver. United States v. Barrow, 400 F.3d 109, 117 (2d Cir. 2005).

Pursuant to Barrow (which interpreted a virtually identical agreement), Berko could trigger the waiver provision not only through presentation of testimony or other evidence, but also if his counsel contradicted Berko's proffer statements either in his jury addresses or through cross-examination. Id. at 118 ("Factual assertions made by a defendant's counsel in an opening argument or on cross-examination plainly fall within this broad language."). Thus, in an opening statement, counsel could trigger the waiver through an assertion of fact that is contrary to Berko's proffer-protected statements. Id. at 119. For instance, if counsel claims in a jury address that Berko is not aware of aspects of the scheme that he proffered about—for example, Ghana Official 1's involvement in the EPA negotiations—then counsel would open the door for the government to introduce those contrary proffer statements through an agent. And on cross-examination of a witness who is testifying consistently with Berko's statements, counsel would trigger the waiver by asserting a contrary fact in the form of a question to suggest that the witness is fabricating his testimony. Id. at 114, 119 (noting that the question, "You made up about meeting the [confidential

75

informant] there that day, didn't you?" opened the door for the government to introduce the proffer statements because it was an implicit factual assertion contrary to those statements).[26]  Moreover, Berko's introduction of evidence—such as evidence implying that a witness is lying—that contradicts a proffer statement also triggers the waiver provision.  United States v. Roberts, 660 F.3d 149, 163 (2d Cir. 2011) ("The factual assertion thus being urged from the documents was that [the government's witness] could not have been on the ramp for the offloading of the Barbados flight.  Because that fact was rebutted by [the defendant's] proffer statements, the district court properly admitted excerpts from those statements into evidence.").  Finally, in the event that counsel for Berko triggers the waiver provisions of the agreement in closing arguments, the government should be permitted to reopen its case and call an FBI agent to testify about Berko's statements.  See, e.g., United States v. Goldenberg, No. 04-CR-159 (NGG) (E.D.N.Y.), ECF Dkt. No. 364 (denying Rule 33 motion and adhering to ruling made during trial to permit government to reopen its case after defendant triggered waiver provisions during closing arguments); see also Goldenberg v. United States, No. 09-CV-4005 (NGG), 2012 WL 1599869, at *4-5 (E.D.N.Y. May 4, 2012) (discussing trial ruling to admit proffer statements after counsel triggered waiver provision during closing statements and denying writ of habeas corpus pursuant to 28 U.S.C. § 2255).

However, the proffer waiver is not automatically triggered by any and all defense arguments and thus does not leave the defendant without an ability to present a defense or

---

[26]    The Second Circuit has recognized that the distinction between challenging perception or recollection of an event and implying that an event did not occur is "more easily stated than applied."  United States v. Roberts, 660 F.3d 149, 158 (2d Cir. 2011).  "In close cases, the identification of what facts are being implied by counsel's questions and arguments may depend on the 'unique insights' a district court gains from actually seeing and hearing these matters pursued in the dynamic context of a trial."  Id.  The Second Circuit is "disinclined to second guess [the district court's] reasonable assessments informed by such insights."  Id.

challenge the government's proof. "The Second Circuit has cautioned that 'arguments or questions challenging the sufficiency of government proof, or the credibility of a witness without a factual assertion contradicting facts admitted in the proffer statement do not trigger a waiver provision.'" Rivera, 2015 WL 1725991, at *3 (quoting Roberts, 660 F.3d at 158).

XVII.   The Court Should Permit the Government to Authenticate Certain Evidence Based on Fed. R. Evid. 902(13) and 902(14)

At trial, the government intends to introduce certain evidence obtained from the defendant's iCloud account (the "iCloud Account") and electronic devices, including a laptop and three iPhones (the "Electronic Devices"). Law enforcement officers searched and/or seized the iCloud Account and Electronic Devices pursuant to judicially-authorized search warrants. Evidence obtained from the iCloud account and Electronic Devices is important evidence of the conspiracy and the defendant's knowing participation in the bribery and money laundering schemes.

To avoid undue delay and unnecessary custodial witnesses, the government is in the process of obtaining certifications pursuant to Federal Rules of Evidence 902(13) and 902(14) authenticating the government exhibits obtained from the iCloud Account and the Electronic Devices. These certifications are being prepared by FBI Computer Analysis and Response Team (CART) analysts who extracted the records. The government will produce the certifications as soon as they are available.

A.   Applicable Law

Rule 902(14) allows for authentication by certification of data copied from an electronic device. Rule 902(13) allows for authentication of records generated by an electronic process or system. Neither the extracts from the electronic devices nor the certifications are testimonial. United States v. Merchant, No. 24-CR-362 (EK), 2026 WL 457435, at *5 (E.D.N.Y.

77

Feb. 18, 2026) (granting the government's motion in limine to authenticate device extractions and reports using Rule 902(13) and 902(14) certifications).

"Evidence is admissible under Rule 901(a) so long as the Government provides a 'rational basis' from which to conclude that the evidence sought to be admitted is indeed what the Government claims it to be." United States v. Laden, No. 98-CR-1023 (LBS), 2001 WL 276714, at *1 (S.D.N.Y. Mar. 20, 2001) (citing, among others, United States v. Inserra, 34 F.3d 83, 90 (2d Cir. 1994)). See also United States v. Natale, 526 F.2d 1160, 1173 (2d Cir. 1975) (the "prosecution need only prove a rational basis from which the jury may conclude that the exhibit did, in fact, belong" to the source and "proof of the connection of an exhibit" to its source "may be made by circumstantial, as well as direct, evidence."). The standard for authentication is not rigorous. Arista Recs. LLC v. Lime Grp. LLC, 784 F. Supp. 2d 398, 419–20 (S.D.N.Y. 2011); United States v. Bout, 651 Fed. App'x 62, 63 (2d Cir. 2016) ("The bar for authentication of evidence under Fed. R. Evid. 901(a) is 'not particularly high'") (quoting United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007)). "Once the Government has met the low bar of 'rational basis,' the problem is no longer one of admissibility to be determined by a judge, but one of credibility to be measured by a jury." Laden, 2001 WL 276714, at *1 (citing United States v. Hon, 904 F.2d 803, 810 (2d Cir.1990) and 5 Weinstein & Berger, WEINSTEIN'S FEDERAL EVIDENCE § 901.02[2], at 901-9). "It is met where 'sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." Id. at 6364 (quoting United States v. Tin Yat Chin, 371 F.3d 31, 38 (2d Cir. 2004)).

Indeed, the Federal Rules of Evidence even provide that a range of evidence is "self authenticating," requiring "no extrinsic evidence of authenticity in order to be admitted." Fed. R. Evid 902. Relevant here, Rule 902 explicitly provides that records or data "generated by an

78

electronic process or system that produces an accurate result" or "copied from an electronic device,

storage medium, or file" are self-authenticating if shown by the certification of a qualified person.

Fed. R. Evid. 902(13); Fed. R. Evid. 902(14).  In relevant part, the Advisory Committee Notes for

Rule 902 justified the addition of these two subsections as follows:

> [T]he Committee has found that the expense and inconvenience of producing a witness to authenticate an item of electronic evidence is often unnecessary. It is often the case that a party goes to the expense of producing an authentication witness, and then the adversary either stipulates authenticity before the witness is called or fails to challenge the authentication testimony once it is presented. . . . Nothing in the amendment is intended to limit a party from establishing authenticity of electronic evidence on any ground provided in these Rules, including though judicial notice where appropriate.

In the context of business records, which provided the conceptual framework for

self-authentication of electronic evidence under Rules 902(13) and (14), the Supreme Court has

held that admitting evidence that has been authenticated by affidavit or certificate does not violate

a defendant's right to confrontation because certifications are not testimonial.  See Melendez-Diaz

v. Massachusetts, 557 U.S. 305 (2009); see also United States v. Qualls, 613 F. App'x 25, 28 (2d

Cir. 2015).  The facts concerning the electronic systems that generate electronic records and the

processes of making electronic copies, like the processes of maintaining business records, are not

testimonial because they only establish authenticity—that the records were generated by a reliable

process and are what they purport to be—and can therefore be established by certification without

implicating the Confrontation Clause.[27]  See United States v. Carter, No. 21-CR-681 (NSR), 2024

---

[27]    Self-authentication of electronic evidence by certification establishes that electronic evidence is authentic, not that it is relevant or non-hearsay.  In this case, the evidence that the government intends to introduce are relevant statements of the defendant and his coconspirators, made during and in furtherance of the charged conspiracy.  This relevance will be

WL 268248, at *3 (S.D.N.Y. Jan. 24, 2024) (holding that a certification pursuant to Rule 902(14) may be used to authenticate evidence without violating the Confrontation Clause)

Once Rule 901's requirements are satisfied, "'the evidence's persuasive force is left to the jury.'" Dhinsa, 243 F.3d at 658 (quoting United States v. Ortiz, 966 F.2d 707, 716 (1st Cir. 1992)); see also Tropeano, 252 F.3d at 661 ("Authentication of course merely renders [evidence] admissible, leaving the issue of . . . ultimate reliability to the jury."). As the Second Circuit explained in United States v. Tin Yat Chin, 371 F.3d 31, 37–38 (2d Cir. 2004), once this "minimal standard is met," "the other party then remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence—not to its *admissibility*." Id. (emphasis in original).

The notice requirements of Rule 902(11) are met by the government's filing this motion in limine. See Carter, 2024 WL 268248, at *3 (granting government's motion to authenticate the decrypted accounts obtained from certain iCloud accounts and stating that sufficient notice pursuant to Rule 902(11) was provided by the filing of a motion in limine).

B.      Discussion

As set forth above, the government is in the process of obtaining certifications pursuant to Rules 902(13) and 902(14) from the CART examiners who conducted the extraction of the iCloud Account and the Electronic Devices. The government will produce the certifications to the defendant as soon as they are ready. The government is not asking the Court to rule on the authenticity of government exhibits derived from the iCloud and the Electronic Devices at this

---

evident from the face of the communications themselves and further established by witness testimony.

time, but rather providing notice to the Court and the defendant that it intends to ask the Court's permission to authenticate the extracts from the iCloud and the Electronic Devices by certification.

XVIII. The Court Should Admit Certain Evidence Based on Fed. R. Evid. 902 and 18 U.S.C. § 3505

At trial, the government intends to authenticate certain business and electronic records pursuant to Fed. R. Evid. 902(11)—certified domestic records of a regularly conducted activity—and 18 U.S.C. § 3505—foreign records of regularly conducted activity. The government has produced the relevant certifications to the defendant and will produce additional certifications as they become available.

The Supreme Court has held that admitting business records that have been authenticated by affidavit or certificate does not violate a defendant's right to confrontation. See Melendez-Diaz, 557 U.S. at 324. The Court explained that "[b]usiness and public records are generally admissible absent confrontation . . . because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial." Id. at 324. Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and therefore are permissible. See, e.g., Qualls, 613 F. App'x at 28; United States v. Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 680-81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005). As the Seventh Circuit explained in Ellis, an authenticating certification under Rule 902(11) is "nothing more than the custodian of records . . . attesting that the submitted documents are actually records kept in the ordinary course of business" and "merely establish the existence of the

81

procedures necessary to create a business record." 460 F.3d at 927. It is the underlying records, not the certification, that are introduced to establish the facts at trial.

Consistent with this understanding of the confrontation right, federal law permits the authentication of business and electronic records by certification and sets forth specific requirements for their admission. Federal Rule of Evidence 902(11) expressly permits the authentication of domestic business records by certification. Courts in the Second Circuit have routinely applied these provisions to admit certified business records at trial. See, e.g., United States v. Komasa, 767 F.3d 151 (2d Cir. 2014); United States v. Ray, No. 20-CR-110 (LJL), 2022 WL 558146, at *15 (S.D.N.Y. Feb. 24, 2022) (noting that bank records, recorded bank calls, telephone records, and other materials may be admitted at trial as business records with supporting certifications); United States v. Kandic, No. 17-CR-449 (NGG), 2022 WL 1266431, at *8 (E.D.N.Y. Apr. 28, 2022) (admitting in limine domestic and foreign travel records, email records, bank records, and other materials as business records supported by custodian certifications); Qualls, 613 F. App'x at 28–29 (affirming district court decision admitting foreign business records based on certification). Similarly, Rule 803(6)(D) provides that a document may be qualified as a record of a regularly conducted activity "by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification." Fed. R. Evid. 803(6)(D); see also United States v. Michel, 879 F. Supp. 2d 291, 304 n.13 (E.D.N.Y. 2012) (bank representative's signed declaration under penalty of perjury sufficiently laid foundation for admission of bank records). Thus, "Rule 902(11) extends Rule 803(6) by allowing a written foundation in lieu of an oral one." United States v. Rom, 528 F. App'x 24, 27 (2d Cir. 2013). Likewise, 18 U.S.C. § 3505 "permits the government to authenticate foreign business records by certification by meeting certain

82

requirements." United States v. Qualls, 553 F. Supp. 2d 241, 245 (E.D.N.Y. 2008), aff'd, 613 F. App'x 25 (2d Cir. 2015).

The government should therefore be permitted to authenticate the domestic records as well as the foreign business records using certifications.  As noted, the government has provided the defendant with the certifications and underlying records in discovery—and will continue to do so as they become available—and the defendant is hereby informed of the government's intention to offer the business records and foreign business records[28] as evidence at trial.  Such a process would eliminate unnecessary custodial witnesses and help the case proceed in an efficient manner without the need for wasteful sidebars.  Accordingly, the government provides notice that it intends to authenticate domestic and foreign business records using certification, rather than live witness testimony.

---

[28]    The government also provided the defendant notice in an April 22, 2026 letter of its intent to offer at trial foreign business records pursuant to Section 3505.

83

CONCLUSION

For the foregoing reasons, the Court should grant the government's motions in limine.

Dated:    Brooklyn, New York
          June 25, 2026

                              Respectfully submitted,

                              JOSEPH NOCELLA, JR.
                              UNITED STATES ATTORNEY

                    By:    /s/_____
                              Jessica K. Weigel
                              Nick M. Axelrod
                              Assistant U.S. Attorneys
                              718-254-7000

                              LORINDA I. LARYEA
                              Chief, Fraud Section, Criminal Division
                              U.S. Department of Justice

                    By:    /s/_____
                              Katherine Nielsen
                              Trial Attorney
                              Katherine Raut
                              Assistant Chief, FCPA Unit
                              (202) 616-5672

84